### SAN LORENZO TITLE & IMPROVEMENT CO. v. CAPLES et al.

No. 2653.

Court of Civil Appeals of Texas. El Paso.
Feb. 27, 1932.

Rehearing Denied March 24, 1932.

McKenzie, Walthall & Gamble, Knollenberg & Cameron, Joseph U. Sweeney, J. E. Quaid, and Sydney Smith, all of El Paso, for appellant.

R. F. Burges, Walter S. Howe, Jr., Roy D. Jackson, and Turney, Burges, Culwell & Pollard, all of El Paso, for appellees.

J. M. CALDWELL, Special Associate Justice.

The appellant, San Lorenzo Title & Improvement Company, a trust, sued E. A. Caples, and Dolores M. Caples, husband and wife, in the usual form of trespass to try title, describing the property as lots 21 and 22 in block 2, Collingsworth subdivision, as shown on a map of such subdivision recorded in the deed records of El Paso county, Tex. It alleged title in fee, and that it and its predecessors in title had been the owners of, and entitled to the possession of, the premises since 1898. It then specially pleaded the title to what is known as "San Lorenzo" banco No. 302, describing it by metes and bounds, and alleged that the property known as "San Lorenzo" banco prior to March 21, 1930, was in the territorial limits of the state of Chihuahua, republic of Mexico, but was on the left side of the Rio Grande, and that on March 21, 1930, the International Boundary Commission classified the land as a "banco," and eliminated the same as "San Lorenzo Banco No. 302."

The appellant further pleaded the Treaty of Guadalupe Hidalgo (9 U. S. Stat. 922) and the Treaty of 1889 (26 U. S. Stat. 1512), creating the International Boundary Commission and the Treaty of 1905 between the United States of America and the United States of Mexico, pleading specially articles 1, 2, 3, and 4 of the Treaty of 1905 (35 U. S. Stat. 1863).

Appellant further pleaded the findings of the International Boundary Commission with reference to the San Lorenzo banco No. 302, and especially that in 1898 it had been cut off from Mexico by avulsion, but that it had remained a part of the United States of Mexico until the finding of the Commission on March 21, 1930, at which date the land was ceded to, and became a part of, the United States of America.

Appellant further pleaded the inviolability of private ownership provided by the Treaty of 1905 and other treaties, and that the dominion over said banco was in the United States of Mexico until March 21, 1930, at which time the dominion passed to the United States of America.

Appellant further pleaded that the same was a banco subject to the jurisdiction of the International Boundary Commission as provided by the treaty.

Appellant further pleaded a title obtained by Alfredo Urias, by libeling the property in accordance with article 728 of the Civil Code of the state of Chihuahua, filed on August 6, 1926, and pleaded in detail the various orders and minutes of the court of first instance in which the libel was filed, by virtue of which the land was declared to be vacant land, and was ordered sold, and, when sold, was purchased by Alfredo Urias and deeded to him by the court of first instance. It does not plead an appraisement of the land as required by the statute nor that the notices were posted at the customary places.

The defendants replied by general demurrer, a plea of not guilty, and a general denial, and further pleaded the statutes of limitations of three, five, and ten years, and also the statutes of limitation of one year next before the commencement of the suit, and then impleaded their warrantor, the City Mortgage Company of El Paso, Tex., with appropriate pleading for recovery from their warrantor for the sums of money paid to it, and for cancellation of notes still held by it as part of the purchase price for the property.

The defendant, the City Mortgage Company of El Paso, Tex., so interpleaded as a warrantor of the title of the defendants Caples, answered with a general demurrer and general denial and a plea of not guilty, and with the pleas of limitation of three, five, ten, and twenty-five years, and also, as to the defendants Caples, tender of performance of their general warranty in the deed of conveyance.

The plaintiff below, appellant herein, filed its first supplemental petition in reply to the answer of the City Mortgage Company, and excepted to the answer with a general demurrer and certain special exceptions and a plea of not guilty to the cross-action of the City Mortgage Company.

Upon hearing of the cause, the trial court overruled the general demurrers of the defendants, and also overruled the general demurrer and special exceptions of the plaintiff to the pleadings of the defendant, the City Mortgage Company, and the case was tried to a jury, submitted upon special issues, all of which were answered favorably to the defendants. The court thereupon rendered judgment in favor of the defendants with appropriate relief for the City Mortgage Company.

## Opinion.

The appellant contends:

(1) That the decision of the International Boundary Commission, dated March 21, 1930, established the fact that the land in dispute

was at all times before that date under the jurisdiction of the United States of Mexico, and subject to disposition as to title by that government.

(2) It further contends that Alfredo Urias obtained title through the judgment of the Mexican court, acting in accordance with the statute of the state of Chihuahua, with reference to the acquisition of vacant lands, and that it now holds by virtue of that title.

Since this is a suit in trespass to try title, and the appellant must recover upon the strength of its own title, it is apparent that the determination of these two questions will determine the validity or invalidity of its claims and of its right to recover.

In order to properly pass upon appellant's first contention, it is necessary to examine the treaties and the diplomatic correspondence between the two nations and the findings of the International Boundary Commission, and in this examination the court must be guided by the following well-established principles:

(1) Treaties are the supreme law of the land, and the courts must take judicial knowledge thereof and of the historical data leading up to them, as well as the construction of them by both the executive and judicial branches of the government.

(2) As to the political effect of a treaty, the interpretation of the executive branch of the government is conclusively binding on the parties to the treaty and on the courts, but the duty rests on the courts to interpret the treaty and apply its provisions to private rights.

The question in this case is not political in its character, but is strictly confined to a contest of private rights between citizens of the United States who reside in the state of Texas.

(3) There is no question of cession of territory in the instant case, as both governments disclaim the right of cession, and the Treaty of 1905 was finally concluded on that basis of understanding between the diplomatic representatives of both countries. Geofroy v. Riggs, 133 U. S. 258, 10 S. Ct. 295, 33 L. Ed. 642; Chamizal Arbitration, Appendix to the Case of the United States of America, vol. 2, p. 676; also page 916 et seq., 967 to 968, 999 et seq., 1034, 1042, 1043, 1044, 1045.

The first boundary treaty between the United States of America and the United States of Mexico was that signed at Washington on January 12, 1828, and finally proclaimed April 5, 1832 (8 U. S. Stat. 372). The second article of this treaty defines the boundary line between the United States of America and the United States of Mexico in exact terms. The third article provides for the appointment of a commissioner and a surveyor for each nation, and directs them when and where to meet, and gives them instruction how to run and mark the line defined in the second article. It further provides that the result agreed upon should be considered a part of the treaty, and have the same force as if it were inserted in the treaty. The function of this Commission was not to make a boundary between the two nations, but to fix with more precision and to mark the location of that boundary as prescribed by the treaty itself.

The Treaty of Guadalupe Hidalgo, signed February 2, 1848, and finally proclaimed July 4, 1848 (9 U. S. Stat. 922, 927), proceeds to state in article 5 thereof what the boundary line of the two republics shall be. It further provides for the appointment of commissions who "shall meet at the port of San Diego, and proceed to run and mark the said boundary in its whole course to the mouth of the Rio Bravo del Norte * * * and the result agreed upon by them shall be deemed a part of this treaty, and shall have the same force as if it were inserted therein."

A careful consideration of the language of this treaty affecting the boundary line between the two nations leads to the inevitable conclusion that the boundary itself was fixed by the treaty, and that the function of the Commission was to mark upon the ground the boundary as it had been so fixed.

In the Treaty of 1853, known as the Gadsden Treaty, signed on December 30, 1853, and finally proclaimed June 30, 1854 (10 U. S. Stat. 1031), we find a similar provision. The boundary is specified in the Treaty, and, after the specification of the boundary, we find a provision that each of the two governments shall nominate a commissioner who shall meet with the other within a limited time, and "proceed to survey and mark out upon the land the dividing line stipulated by this article, where it shall not have already been surveyed and established by the mixed commission, according to the treaty of Guadalupe." (Article 1.)

It further provides that, when so fixed by the commissioners, their decision shall become an integral part of the treaty without the necessity of ulterior ratification or approval, and without room for interpretation of any kind by either of the parties contracting. This treaty clearly follows the policy of each of the other two treaties in first defining the boundary between the two nations, and afterwards appointing a commission whose sole duty and function was to ascertain and mark the boundary so fixed.

In 1882 the two nations entered into a Boundary Convention which was signed at Washington on July 29, 1882, and finally proclaimed March 5, 1883 (22 U. S. Stat. 986). The purpose of that Convention is stated in article 1 as follows: "With the object of ascertaining the present condition of the

monuments marking the boundary line between the United States of America and the United States of Mexico, established by the treaties of February 2nd, 1848, and December 3rd, 1853, and for determining generally what monuments, if any, have been destroyed or removed and may require to be rebuilt or replaced, a preliminary reconnaissance of the frontier line shall be made by each government, within six months from the exchange of ratifications of this convention."

Article 2 provides for the appointment of an International Boundary Commission.

Article 3 prescribes the duties of the Commission, and limits its power and authority. The power and authority of the Commission as thus established is fully set out and fully limited in article 3, which we quote: "The international boundary commission shall be required and have the power and authority to set in their proper places along the boundary line between the United States and Mexico, from the Pacific Ocean to the Rio Grande, the monuments heretofore placed there under existing treaties, whenever such monuments shall have become displaced; to erect new monuments on the site of former monuments when these shall have been destroyed; and to set new monuments at such points as may be necessary, and be chosen by joint accord between the two Commissioner Engineers-in-Chief. In rebuilding and replacing the old monuments and in providing for new ones, the respective reports of the reconnaissance parties, provided by Article I, may be consulted; provided, however, that the distance between two consecutive monuments shall never exceed eight thousand metres, and that this limit may be reduced on those parts of the line which are inhabited or capable of habitation."

It will be observed that no authority is granted to the Boundary Commission in this treaty to alter or amend the boundary line between the two nations as fixed by the Treaty of Guadalupe Hidalgo and the Gadsden Treaty, but that their power and authority is strictly limited to the ascertainment and remarking of the lines as fixed by those Treaties.

In 1884 it was recognized by the two governments that the boundary of the Rio Grande and Rio Colorado as fixed by the fifth article of the treaty of Guadalupe Hidalgo and the first article of the Gadsden Treaty was subject to change on account of the operation of natural forces in the two rivers, and, to protect the interest of both nations in the light of international law concerning avulsion and erosion, the Treaty of 1884 was signed at Washington November 12, 1884, and finally proclaimed September 14, 1886 (24 U. S. Stat. 1011, 1012).

The former treaties, as contracts between the two nations, were subject to the principles of international law. By those principles changes in the location of the middle of the river "following the deepest channel where it has more than one," when made by erosion and accretion, had no effect upon the boundary which still remained in the deepest channel of the running stream, but such changes as were made by avulsion left the boundary in the middle of the stream bed at the place where it was before the avulsive change. Chamizal Arbitration, Appendix to the Case of the United States of America, vol. 2, pp. 559 to 567; State of Nebraska v. State of Iowa, 143 U. S. 359, 12 S. Ct. 396, 36 L. Ed. 186.

The rule to be observed thereafter in determining the boundary line between the two countries is set down in articles 1 and 2 of the Treaty of 1884, which read as follows:

Article 1: "The dividing line shall forever be that described in the aforesaid Treaty and follow the center of the normal channel of the rivers named, notwithstanding any alterations in the banks or in the course of those rivers, provided that such alterations be effected by natural causes through the slow and gradual erosion and deposit of alluvium and not by the abandonment of an existing river bed and the opening of a new one."

Article 2: "Any other change, wrought by the force of the current, whether by the cutting of a new bed, or when there is more than one channel by the deepening of another channel than that which marked the boundary at the time of the survey made under the aforesaid Treaty, shall produce no change in the dividing line as fixed by the surveys of the International Boundary Commissions in 1852; but the line then fixed shall continue to follow the middle of the original channel bed, even though this should become wholly dry or be obstructed by deposits."

After extensive diplomatic correspondence and after full consideration of international law, the representatives of the two nations agreed that there should be substituted the language of article 2 of the Treaty of 1884 as above quoted. The middle of the deepest channel of the river was still the boundary of all places not within that exception, but followed the Emory and Salazar line where the exception obtained.

The International Boundary Commission provided for in the Treaty of 1882 expired by limitation, and the Treaty of 1889 signed at Washington March 1, 1889, 26 U. S. Stat. 1512, was entered into establishing the present Boundary Commission. Its existence was and has been continued by subsequent Conventions between the two nations up to date. In the preamble to this Treaty it is recited: "The United States of America and the United States of Mexico, desiring to facilitate the carrying out of the principles contained

in the treaty of November 12th, 1884, and to avoid the difficulties occasioned by reason of the changes which take place in the bed of the Rio Grande and that of the Colorado River, in that portion thereof where they serve as a boundary between the two Republics, have resolved to conclude a treaty for the attainment of these objects, and have appointed as their respective Plenipotentiaries. * * *"

Article 1 provides that: "All differences or questions that may arise on that portion of the frontier between the United States of America and the United States of Mexico where the Rio Grande and the Colorado Rivers form the boundary line, whether such differences or questions grow out of alterations or changes in the bed of the aforesaid Rio Grande and that of the aforesaid Colorado River, or of works that may be constructed in said rivers, or of any other cause affecting the boundary line, shall be submitted for examination and decision to an International Boundary Commission, which shall have exclusive jurisdiction in the case of said differences or questions."

Article 2 provides for the appointment of a Commission; article 3 provides for the manner and place of meeting; article 4 states and limits the power of the Commission, and is here set out in full as follows:

Article 4: "When, owing to natural causes, any change shall take place in the bed of the Rio Grande or in that of the Colorado River, in that portion thereof wherein those rivers form the boundary line between the two countries, which may affect the boundary line, notice of that fact shall be given by the proper local authorities on both sides to their respective Commissioners of the International Boundary Commission, on receiving which notice it shall be the duty of the said Commission to repair to the place where the change has taken place or the question has arisen, to make a personal examination of such change, to compare it with the bed of the river as it was before the change took place, as shown by the surveys, and to decide whether it has occurred through avulsion or erosion, for the effects of Articles I and II of the convention of November 12th, 1884; having done this, it shall make suitable annotations on the surveys of the boundary line."

Article 5 points out the duty with reference to works being constructed in either of the rivers.

Article 6 requires personal examination of the matter which occasioned the change, the question or the complaint, and requires the Commission to give its decision in regard to the same, complying with requirements or regulations to be established by the Commission and approved by both governments.

Article 7 provides that the Commission shall have the power to call for papers and information, to summon witnesses, and to take testimony with reference to the matters on which they are required to give a decision.

Article 8 provides that the judgment of the commissioners shall be binding on both governments, unless one of them shall disapprove it within one month reckoned from the day on which it shall have been pronounced.

The power and authority to make inquiry, receive papers and information, and take testimony and to make personal examination of the matter and to give decisions, is strictly confined to the duties prescribed in articles 4 and 5 of the Convention, and, as affects the present case, "to make a personal examination of such change, to compare it with the bed of the river as it was before the change took place, as shown by the surveys, and to decide whether it has occurred through avulsion or erosion, for the effects of Articles I and II of the convention of November 12th, 1884."

No new agreement is made between the two nations with respect to the boundary, nor is the Commission empowered to enter into any new agreement, but the Commission is expressly instructed to find the facts, "for the effects of Articles I and II of the convention of November 12th, 1884."

The Conventions continuing the International Boundary Commission make no change in the powers of that Commission.

The International Boundary Commission found great difficulty in applying the principles enunciated in the Treaty of 1884 to the actual conditions which existed in the river, and these difficulties were brought to the attention of the respective state departments. Among the difficulties with which they had to cope were two conditions which were not taken care of by the Treaty of 1884, to wit:

First, they found that in some instances land was added under article 1 of the Treaty of 1884 by erosion and accretion to the land belonging to the opposite nation, but that by means of a subsequent rise in the river this land added under article 1 was cut away from the nation to which it belonged under the provisions of article 2 of that treaty by an avulsive action of the river, and thus rights accrued by virtue of the application of both sections.

Again, a tract of land might be cut off by avulsion and form a true "banco," but by subsequent erosive action of the river a strip of land would be interposed between the true channel of the stream and the "banco" as thus cut off, out of which grew confusion in the application of the principles of articles 1 and 2 of the Treaty of 1884. The diplomatic correspondence between the two countries and the reports of the International Boundary Commission are replete with cases

of special difficulty in making proper application of those principles.

In an effort to find a way out of these difficulties and to fix a rule by which they might be avoided, the Secretary of State for the United States of America drafted and sent to the State Department of the United States of Mexico a tentative treaty which he suggested might obviate these troubles. This tentative draft of the treaty was that inclosed in the letter from Secretary Olney to Don Matias Romero, the diplomatic representative of the Mexican government in Washington, dated February 19, 1896. As bearing on the authority of the International Boundary Commission, it is significant to note that in the proposed article in that draft of the treaty, which was never adopted, it was provided that the transfer of the "banco" should be announced "with definite metes and bounds by an International Boundary Commission in the form and manner that other judgments on questions submitted to them are announced." If this language had been adopted by the high contracting parties, there would be no doubt with reference to the date on which the right of sovereignty and dominion accrued with reference to bancos, but, having been eliminated, we must hold that the authority of the Commission on that point was denied.

Subsequent diplomatic correspondence between the two nations culminated in the Treaty of 1905. It was not found easy to draft a satisfactory convention by virtue of the fact, heretofore referred to in this opinion, that the Mexican government took the position that it had no authority to cede territory, which position was also concurred in by the State Department of the United States of America so far as authority to cede land belonging to a state was concerned. This difficulty was finally obviated by the suggestion that this treaty did not concern the cession of territory, but merely concerned the fixing of the boundary separating the territory, the sovereignty of which was questionable. This suggestion made by the State Department at Washington was accepted by the State Department of the United States of Mexico, and the treaty written and signed in the form in which it now stands. Every reference to the powers of the International Boundary Commission contained in this diplomatic correspondence was eliminated from the final draft of the treaty, and the treaty as signed left the Commission with the powers and authority which it had previously had, and no more.

The Treaty of 1905, for the elimination of the "bancos" of the Rio Grande from the effects of article 2 of the Treaty of November 12, 1884, was signed at Washington March 20, 1905 (35 U. S. Stat. 1863), and proclaimed June 5, 1907. Fifty-eight bancos or areas of land coming directly under article 2 of the Treaty of 1884 had, at that time, been surveyed by the International Boundary Commission, and maps thereof returned to the respective governments for the effect of articles 1 and 2 of the Treaty of 1884. The Treaty of 1905 disposes of those bancos in article 1, appropriating to the United States of Mexico all bancos located on the right of the deepest channel of the stream, or to the right of the boundary as fixed by the Treaty of Guadalupe Hidalgo and the Gadsden Treaty, and appropriating to the United States of America all those bancos already surveyed and which lay on the left bank of the deepest channel of the stream. This is, in effect, to say that the boundary is in the place where it was agreed to be in the Treaty of Guadalupe Hidalgo, to wit, in the middle of the deepest channel of the river, wherever that line might be, except as to those bancos the area of which was over 250 hectares or with a population of 200 souls.

Article 2 of the Treaty of 1905 makes the further provision that the rule of elmination established by article 1 should be applied to all those bancos already formed, but not yet surveyed, and all those bancos which should subsequently be formed by the action of the river. It does not give to the International Boundary Commission the power to fix the boundary. It does give to them the power and authority to mark and establish the location of the boundary and to determine whether or not a given banco comes within the exception mentioned in article 2.

██ But appellant contends in its supplemental brief that the language used in article 5 of the Treaty of 1884 conclusively settles the jurisdiction of the territory cut off by evulsive changes.

Article 5 of the Treaty of 1884 reads as follows: "Rights of property in respect of lands which may have become separated through the creation of new channels as defined in Article II hereof, shall not be affected thereby, but such lands shall continue to be under the jurisdiction of the country to which they previously belonged. In no case, however, shall this retained jurisdictional right affect or control the right of navigation common to the two countries under the stipulations of article VII of the aforesaid Treaty of Guadalupe Hidalgo; and such common right shall continue without prejudice throughout the actually navigable main channels of the said rivers, from the mouth of the Rio Grande to the point where the Rio Colorado ceases to be the international boundary, even though any part of the channel of said rivers, through the changes herein provided against, may be comprised within the territory of one of the two nations."

When a comparison is made between article 5 of the Treaty of 1884 and article 1, in connection with article 4 of the Treaty of

1905, it is apparent that the first paragraph of article 5 of the Treaty of 1884 cannot be read in connection with article 1 of the Treaty of 1905, and both stand. Article 5 of the Treaty of 1884 continues the lands under the jurisdiction of the country to which they previously belonged; article 1 of the Treaty of 1905 utterly transfers the jurisdiction, as well as the land included in the bancos mentioned in that article, part to the United States of Mexico and part to the United States of America, and expressly carries the dominion and jurisdiction of each to the nation to which it is apportioned. If we undertake to read the first paragraph of article 5 of the Treaty of 1884 into the Treaty of 1905, we have a conflict with reference to the dominion and jurisdiction which cannot stand, because the lands, the dominion and jurisdiction of the country to which the bancos thus transferred previously belonged, would be directly antagonistic to the dominion and jurisdiction given under the Treaty of 1905.

Article 4 of the Treaty of 1905 makes express provision for private titles to lands situated on the bancos, as well as express provision for the citizenship of the persons residing thereon, and, when the two treaties are construed together, we think that the Treaty of 1905 supersedes the Treaty of 1884 in so far as its treatment of property rights is concerned. This is in accordance with the familiar rule that, where there are two constructions which might be given, one of which is consistent with the provisions of the statute or treaty, and the other of which is inconsistent, the consistent construction will prevail.

That this construction is correct and was in contemplation of the respective State Departments is borne out by the following extracts from the diplomatic correspondence on this subject before the Treaty of 1905 was adopted:

On May 1, 1899, Senor Mariscal, secretary of foreign relations of the Mexican Republic, wrote to Mr. McCreery, the Minister of the United States of America to Mexico, as follows:

"Department of Foreign Affairs,
Mexico, May 1, 1899.

"Mr. Charge D'Affaires: I had the honor to receive your notes of the 21st and 28th ultimo, and with the second a copy, elegantly bound, of the report of the proceedings of the International Boundary Commission, a present which I much appreciate. In both notes, under instructions from the Government which you represent, you recommend, with the urgency proper in the case, a definite decision as to the elimination or non-elimination of the bancos which, owing to natural causes, have been formed in that part of the Bravo between the points of affluence of the

Rio Verde and its mouth in the Gulf of Mexico, as graphically represented in the four sheets of the photographic copy.

"I have laid your communication, and all matter relating to the case, before the President of the Republic, and by his direction I have the honor to inform you that Mexico, like the United States, is decidedly in favor of the elimination of the bancos, judging it to be the only way to avoid questions of sovereignty and jurisdiction. Under the old and accepted system which we have applied to the Bravo, that of using rivers to define the frontier boundary, it must be accepted as an invariable basis that one bank belongs to one country and the bank opposite to the other. The actual boundary, where the bancos are situated, interferes with the application of this basis, and therefore nothing is better than to eliminate, granting that it is not only possible but easy, the elements which interfere with it. This principle being accepted, it remains to adopt the form of applying it, and there can be no other form than that of a diplomatic convention. Documents with which you are perfectly familiar propose and prepare the way for it; they are: the Proceedings of the International Boundary Commission of January 15, 1895, of November 27, 1897, and of June 14, 1898, and the draft of the treaty submitted by the Honorable Mr. Olney to the representative of Mexico in Washington on February 29, 1896.

"These documents are, however, open to a serious objection,—the use of abstract terms and generic definitions, which tomorrow may be an inevitable source of vexatious ambiguities. To do away with them, considering the degree of advancement reached in hydrographic studies by the International Commission, it will be sufficient to utilize this study and give it the rank of an agreement made under a convention.

"I have the honor, therefore, by direction of the Chief Magistrate, to propose to you that our Governments carry it into effect on the following basis, which you will please submit, if you think it proper, to your Government: Clear and exact reference to the topography, with designation by name of the bancos to be eliminated, and also to the articles of prior treaties which are in conflict with the principle of the elimination of bancos, and which, therefore, should be modified; foreseeing future changes in the course of the Bravo, and for a decision in view of them, to prorogue the International Commission for a prudent period. Lastly, the convention will have to establish rules relative to citizenship, property and servitudes on the bancos in question, in order that these rights may not be affected by the change of sovereignty and jurisdiction.

"I renew, etc.,

"Igno. Mariscal.

"Mr. Fenten R. McCreery, etc. etc."

Chamizal Arbitration Appendix to the Case of the United States, vol. 2, p. 1017.

The language used in the second paragraph "under the old and accepted system which we have applied to the Bravo, that of using rivers to define the frontier boundary, it must be accepted as an invariable basis that one bank belongs to one country and the bank opposite to the other," crystalizes the ideas of the diplomatic branches of the two governments, and affords the correct basis for the construction of the treaties either for political effect or for application by the judicial branch.

The proposal set out in the last paragraph of the letter quoted was accepted by the representatives of the United States and subsequently written into the Treaty of 1905.

The language of the Treaty of 1905, both in article 1 and in article 4, is too explicit to admit of any other construction.

We have quoted at length from all these treaties in order that the policies of the two governments may be readily seen. From this consideration it appears that there was a change from the original provision of the Treaty of Guadalupe Hidalgo, to wit, "from thence up the middle of that river, following the deepest channel," by the Treaty of 1884, which introduces the principles of international law of avulsion and erosion. This was found to be so unsatisfactory that the Treaty of 1905 was entered into and readopted the shifting boundary created by the Treaty of Guadalupe Hidalgo and again agreed to in the Gadsden Treaty, but in the following words: "That is to say, following the deepest channel of the stream."

It laid upon the Commission the duty of applying the same boundary line to bancos formed but not yet surveyed and bancos yet to be formed. It fixed the boundary, but left the Commission the duty of ascertaining and marking it.

The authority of the Boundary Commission has never extended to the fixing of the boundary line, but merely to the duty of marking and determining the location of that line as fixed by treaty. It follows that, under the present treaty provision, whenever the river has cut off by avulsion a portion of the land from one side or the other, the right of political dominion and sovereignty over that particular portion of the land so cut off is immediately by the terms of the treaty transferred to the country to which it has been added by the action of the natural forces of the river. The right of political dominion and sovereignty is here distinguished from the actual dominion and sovereignty. The actual dominion and sovereignty might continue until such time as the International Boundary Commission has made its investigations and rendered its decision, and for thirty days thereafter, at which time the actual dominion and sovereignty becomes merged with the right of dominion and sovereignty effected by the change in the river in pursuance of the terms of the treaty. This recognizes the agreement of the State Department settling the date on which every vestige of authority ceased.

The appellant contends that Minute No. 123, promulgated on March 21, 1930, by the International Boundary Commission, affirmatively finds that the "San Lorenzo" banco No. 302 had been at all times prior to that date in Mexico. A careful reading of Minute No. 123 does not seem to us to bear out this contention. They merely find that the records show that during the floods in the Rio Grande of July, 1898, a tract of land known as the "Bosque del Real de San Lorenzo" was segregated from Mexican territory, and further recite that the consulting engineers of the Commission reported that a careful consideration of all the evidence showed that a true avulsive change occurred in 1898, and that as a result the banco was formed coming under the Treaty of 1905. They did not find anything with reference to changes prior to 1898.

The principles enunciated in Kenedy Pasture Co. v. State, 111 Tex. 200, 231 S. W. 683; United States v. Reynes, 1 How. 127, 13 L. Ed. 74; Davis v. Police Jury, 9 How. 280, 13 L. Ed. 138, and many other decisions, appear to us to be applicable to the present case. If the right of dominion and sovereignty was transferred by the action of the river when the banco was cut off, or, as in the present case, at the date on which the treaty was effective, then the sovereignty retained by the United States of Mexico over "San Lorenzo" banco No. 302 was such a sovereignty as might be necessary for the government of the territory and police protection, but could not extend to the granting of titles or to any act which might prejudice the right of the United States of America in the territory thus acquired by it. It is so held in the cases above cited, and we so hold in the present case. From this it follows that we overrule the contention of appellant that the court of first instance in the city of Juarez in the state of Chihuahua had authority and jurisdiction to issue the title on which the appellant depends. We hold that, even though it might have had the political right to govern and police the territory of the "San Lorenzo" banco, it had no right after the date of the treaty to do any act which would prejudice the rights of the United States of America or of the state of Texas in so far as the land included therein is concerned. We do not wish to be understood as holding that under the facts in this case the United States of Mexico had control of this "banco." The record seems to prove the contrary to be true.

Having decided that there was no authority residing in the United States of Mex-

ico to grant the title on which the appellant depends, it may be superfluous to consider the second contention of the appellant that it has a good and valid title emanating from the court of first instance in the state of Chihuahua. We have examined with great care the pleadings and the evidence introduced in this case to maintain the appellant's title, and have reached the conclusion that the proceeding under which Alfredo Urias sought to obtain title to the "San Lorenzo" banco is a special proceeding, and that each and every step necessary to perfect that title must be both pleaded and proved. Such would be the case in special proceedings in a Texas court under the Texas statutes.

The appellant, in attempting to plead its title, omits to plead an appraisement as required by the statutes of Chihuahua, and also that certain notices required were published at the usual and customary places. The proof offered and admitted over the objection of appellees fails to show a statutory appraisement, and that the notices were given as prescribed by law. The description of the property is such that it cannot be located without extrinsic aid. It is true that appellants offered in evidence a so-called correction which, if admissible, might supply the deficiency in description. This correction is inadmissible because it shows to have been made by another court of minor character and not by the court of first instance, which had jurisdiction of the original proceeding. In that court it was entered ex parte and without notice such as is required for the correction of a judgment after the term at which it is rendered. No notices were given to the people in possession.

The appellant contends that no notice was due occupants of the so-called vacant land asserting that by virtue of the Mexican statute of 1856 and the present constitution of Mexico aliens cannot acquire rights to real property in Mexico and especially in the border leagues. It is a sufficient answer to this contention to cite the provisions of the various treaties with reference to the preservation of titles and the rights of citizens of either nation affected by the change in boundaries.

■■ The treaties are solemn contracts between the nations, and have the effect of suspending the law as to aliens in so far as the same are in conflict with the rights guaranteed in the treaties. To hold otherwise is to annul all provisions of the treaties with reference to rights in real property. It was therefore essential that the occupants of the banco have the notice required by the statutes of Chihuahua which it affirmatively appears was not given.

But the appellant contends that this matter is precluded by the judgment of the court of first instance, and that its judgment cannot be attacked collaterally. As said above,

the proceeding is a special one, and its validity depends upon the absolute accuracy with which the statute is followed. Cunningham v. Robison, 104 Tex. 227, 136 S. W. 441; Mingus v. Wadley, 115 Tex. 551, 285 S. W. 1084; Thatcher v. Powell, 6 Wheat. 119, 5 L. Ed. 221.

■ This being one of the steps necessary to give jurisdiction to enter the judgment, it would be anomalous to hold that the recital in the judgment was of greater effect than the actual fact, or that the very step, which, being omitted, makes the judgment void, could not be proved to show its invalidity. The trial court properly admitted the testimony concerning occupancy, and the testimony abundantly shows the lack of jurisdiction and that the judgment is void, not merely voidable, and, being void, is subject to attack anywhere at any time.

For all of which reasons we conclude that, if we had decided that the right of sovereignty and dominion as well as the actual sovereignty and dominion of the "San Lorenzo" banco resided in the United States of Mexico until one month after the promulgation of Minute No. 123 by the International Boundary Commission, even in that event the plaintiff's title is not sufficient, on account of the irregularities cited above, to enable it to recover from the defendant in a case in trespass to try title in a Texas court.

The holding of this court above set out would justify a reversal of the case with instructions to the trial court to sustain the general demurrer of the defendants. The case was not tried upon that theory, and neither the appellant nor the appellee has assigned error on that ground, and, while this court might, of its own motion, determine the case on fundamental error, we think it best to examine the case as tried, and upon the theory which evidently was followed both by appellant and appellee in the court below.

Appellant introduced as evidence on the main case Minute No. 123, promulgated by the International Boundary Commission. This minute expressly refers to the report of the consulting engineers, dated March 18, 1930, and which report was approved by the Commission and attached to Minute No. 123 and made a part thereof. The report of the consulting engineers attached maps, namely, Banco Map No. 302 "San Lorenzo" and a map of river movements near "San Lorenzo." The map of the river movements near "San Lorenzo" superimposes eight river channels from the following sources: (1) The Salazar Survey of 1852—an official Boundary Commission record; (2) the Texas patent river of 1854 taken from the El Paso county records; (3) the Heldt river of 1899, Heldt being county engineer at that time; (4) the United States Geological Survey river made in 1891; (5) the Randolph river of 1889; (6) the river

of 1897, being a survey made by A. H. Parker, county engineer in that year; (7) the abandoned channel around the banco and the adjacent river as surveyed by Follet in 1899; (8) the river of 1928 as surveyed by the Boundary Commission.

This map is duly signed by the commissioners of the United States and of Mexico. The testimony was not objected to by the defendants, and stands a part of the uncontested testimony in the trial of the case. An examination of this map in comparison with the exhibits in the statements of fact shows that lots 21 and 22, block 2, Collingsworth subdivision, lie north of the Emory-Salazar channel and north of the Patent river of 1854. It further shows that the Patent river of 1854 is the "Rio Viejo" referred to in the field notes of the patent issued by the state of Texas to Buchanan, the assignee of Collingsworth.

The testimony of R. F. Owen with Exhibit ZZ confirms the location of the Rio Viejo as coincident with the Patent river of 1854 shown on the commissioners' map of river movements.

In the report of the consulting engineers to which this map is attached, they conclude that from 1889 until 1898 the river ran around the banco. They make no finding as to the location of the river before the year 1889.

Property rights of citizens of either nation are inviolably respected under the provisions of each and every treaty since and including the Treaty of Guadalupe Hidalgo, and if, as is here found by the consulting engineers, the "Rio Viejo" ran according to the patent line of this map, which was adopted and made a part of the commissioners' report, then the patent to Buchanan of the Collingsworth Survey 13 lay wholly in Texas at the date the patent was issued in 1861, and the subsequent changes in the river bed could not work to the prejudice of that title emanating under the authority of government which had dominion of it at that time. The treaties in their very terms expressly reserve such titles, and the fact that subsequent river movements may have placed the land on the right-hand side of the river could not affect the titles which were theretofore issued.

The appellee objected to the introduction of the proceedings in the court of first instance in the state of Chihuahua on the ground that it affirmatively appeared that the court had not jurisdiction of the subject-matter nor the land in controversy nor of the owners and claimants nor of the persons in possession thereof. At the time this objection was made Minute No. 123 had not been introduced by the plaintiffs in this case, but the objection became especially pertinent after Minute 123 had been introduced, and should have been sustained on the ground above stated in this opinion, that the title was shown by Minute 123 and the report of the consulting engineers and maps which were attached and made a part of Minute 123 to have emanated from Texas at the time when the land lay wholly in Texas, and that the title was therefore protected under those clauses of the treaties pertaining to property rights.

■ The court properly overruled the objections of the appellant to the introduction of the title emanating from the state of Texas for a similar reason.

It follows that there is no error in submitting the case to the jury upon the issues on which it was submitted, unless indeed and in fact the court should have instructed a verdict in favor of the defendants without submitting any question to the jury.

All of appellant's assignments of error are overruled, and the judgment of the trial court is affirmed.

PELPHREY, C. J., and GOWAN JONES, Special Associate Justice, concur.

J. M. CALDWELL and GOWAN JONES were Special Associate Justices appointed by Governor Sterling to fill the places of Associate Justices HIGGINS and WALTHALL, who were disqualified.