575 P.2d 88

David HOLGUIN, Robert Bullard, O. L. Smith, Lawrence Horner and Mrs. Robert S. Hayner, Plaintiffs-Appellants,

v.

ELEPHANT BUTTE IRRIGATION DISTRICT, Defendant-Appellee.

No. 11066.

Supreme Court of New Mexico.

Sept. 9, 1977.

Martin, Martin & Lutz, James T. Martin, Jr., William L. Lutz, Las Cruces, for plaintiffs-appellants.

Threet, Threet, Glass & King, Martin E. Threet, R. Michael Hooe, Albuquerque, for defendant-appellee.

OPINION

EASLEY, Justice.

Plaintiff, David Holguin and five others (hereinafter Landowners—which shall at times refer to plaintiffs predecessors in title) brought suit against Elephant Butte Irrigation District (EBID) for a declaratory judgment to establish their water rights on land located within the geographical limits of the irrigation district. Landowners also

claimed damages for failure of EBID to provide irrigation facilities and prayed for damages for improvements made by them because of alleged representations by EBID agents that their water rights would not be contested. EBID petitioned for dismissal for failure to join the New Mexico State Engineer and the United States of America as indispensable parties and asked for summary judgment with regard to the other claims. The effect of the trial court's decision was to grant summary judgment as to all issues. Landowners appealed to this court. We affirm the decision of the trial court that the United States is an indispensable party, which is the dispositive issue.

Although there are a multitude of unique and interesting questions raised in this case, the controlling issue is whether the United States, which owns the dams and the irrigation works and contracts with EBID through the Federal Bureau of Reclamation and Irrigation (Bureau) for the distribution of the water, is an indispensable party, particularly in light of the fact that the United States has a treaty with Mexico to deliver specified quantities of water to Mexico on a periodic basis and has other obligations and duties under the law and by contract.

*Facts*

The Rio Grande River has played a vital role in hundreds of years of colorful history in Colorado, New Mexico, Texas and Mexico. "The Rio Grande is not only a river of song and story, but also a symbol of the Spanish heritage in what is now the American Southwest. It is the second longest river in the United States and is the only river of this country having long segments, first wholly within this nation and next forming an international boundary."[1] Of all the interesting developments in the history of the river, none could be as dramatic and far-reaching in its effect as the federal government's decision to harness the unappropriated waters of the Rio Grande and its tributaries for irrigation and other purposes in southern New Mexico and southwest Texas.

On June 17, 1902, the Reclamation and Irrigation Act was passed by Congress authorizing the construction of irrigation dams and works.[2] The Rio Grande Project was passed by Congress in 1905.[3] The Territorial Legislature in New Mexico in 1907 passed a comprehensive water code in which it was provided that the United States under the Reclamation Law could give notice to the state of its intention to utilize certain specified unappropriated water and that water would not be subject to appropriation by others, provided the federal government proceeded thereafter to construct irrigation works under the Reclamation Law.[4]

The Reclamation Service (now Bureau) gave notice to the New Mexico State Engineer in 1906 that the federal government intended to appropriate 730,000 acre-feet of water per year from the unappropriated waters of the Rio Grande which water would be impounded for the Rio Grande Project. In 1908, the claim was expanded to cover all of the unappropriated waters of the Rio Grande and its tributaries.

In conjunction with the development of the Rio Grande Project, the federal government found it necessary to negotiate with Mexico to settle longstanding differences regarding the delivery of water to that country. A treaty was signed on May 21, 1906, in which the irrigation developments under the Rio Grande Project were mentioned indicating an intent by our government to integrate the two developments.[5] The treaty called for the United States to deliver to Mexico a specified amount of

1. *El Paso County Water Imp. Dist. No. 1 v. City of El Paso*, 133 F.Supp. 894 (W.D.Tex.1955).

2. 43 U.S.C. §§ 372, 373, 381, 383, 391, 392, 411, 416, 419, 421, 431, 432, 434, 439, 461, 491 and 498 (1970).

3. Act of February 25, 1905, ch. 798, 33 Stat. 814.

4. Ch. 102, § 22, 1905 N.M. Laws, § 75–5–1, N.M.S.A.1953.

5. Convention of May 21, 1906, 34 Stat. 2953.

water each month totaling 60,000 acre-feet per year.

The United States executed a contract with EBID on January 7, 1918. On January 17, 1920, a contract was entered into between the United States and the El Paso County Water Improvement District No. 1. By May 1, 1939, an interstate compact had been ratified and had become effective among the states of Colorado, New Mexico and Texas, whereby "causes of present and future controversy" would be removed.[6] The compact sets out in detail the amounts of water to be delivered by the upstream states and when it will be forthcoming.

EBID was organized by property owners on the lower Rio Grande in New Mexico to cooperate with the Bureau to provide irrigation for their lands. EBID negotiated numerous contracts over the years with the Bureau regarding the construction, operation and maintenance of the elaborate irrigation works and the details of furnishing water to the members. Unfortunately, the contracts that were in effect at the time of the decision of the trial court on EBID's motion in this case were not made a part of the record.

All of the acreage owned by Landowners is what EBID characterizes as suspended land, or land not to be irrigated. The undisputed evidence is that it would not be economically feasible for EBID to construct irrigation works that would deliver water to this property. EBID has made no effort since its inception to construct works to deliver water to the lands in question. However, these Landowners have paid a nominal "general assessment" which is charged against all suspended land in the district, with the exception of those tracts that consist of less than two acres. Landowners were not charged and never paid for any water used from the project, although all the other property owners who had contracted to join EBID were obligated to do so.

Landowners never made applications to EBID to have their lands become a part of the district, nor had they been granted water rights by the New Mexico State Engineer. Nevertheless, Landowners and their predecessors have been appropriating water by pumping in varying amounts from the Rio Grande at least since 1930. One of them may have had water rights prior to the time the Bureau gave notice to the State of the intent to appropriate all the unappropriated waters of the Rio Grande and its tributaries in 1908.

At least by July 3, 1933, the Board of Directors of EBID was aware that Landowners were pumping from the river although they had not signed water contracts in the manner prescribed by law. EBID on that date made it known to the Bureau that Landowners were appropriating the water without a contract and without paying for it. EBID requested that water be denied to those persons using it without a contract. After that, for over forty years, letters went back and forth between EBID and the Bureau, surveys were made of the unauthorized appropriations, letters were written to the appropriators demanding that they pay for the water and that they enter into contracts with EBID. However, there is no evidence in the record that either EBID or the Bureau made demands that the persons stop pumping water. Nothing of consequence was done to end what was called the "illegal appropriations."

In 1973 EBID notified the State Engineer of the details involving this situation. His investigation and subsequent actions gave rise to the filing of this declaratory judgment and damage action.

*Indispensable Parties—N.M.R.Civ.P. 19*

Our present rule of procedure regarding joinder of parties, N.M.R.Civ.P. [§ 21–1–1(19), N.M.S.A.1953], was adopted in 1969. It provides in material part that "[a] person * * * shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest * * * and * * * the disposition of the action in his absence may (i) * * * impair or

---

6. Ch. 33, 1939 N.M. Laws, § 75–34–3, N.M.S.A. 1953.

impede his ability to protect that interest
* * * ."

Subsection (b) of the rule states in part: "If [such] a person * * * cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed * * * or * * be dismissed, the absent person being thus regarded as indispensable." Thus deeming a party "indispensable" is a conclusion the court reaches after weighing various factors, some of which are mentioned in the remaining part of Rule 19(b). The obvious purpose behind the amended rule is to insure that courts reach decisions regarding indispensability only after a careful and thoughtful analysis as to whether it is feasible to proceed.

In *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968) the U.S. Supreme Court explained the same rule in the Federal Rules as follows:

> To say that a court "must" dismiss in the absence of an indispensable party and that it "cannot proceed" without him puts the matter the wrong way around: a court does not know whether a particular person is "indispensable" until it has examined the situation to determine whether it can proceed without him.
>
> *Id.* at 119, 88 S.Ct. at 743.
>
> Whether a person is "indispensable," that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of particular litigation. There is a large category, whose limits are not presently in question, of persons who, in the Rule's terminology, should be "joined if feasible," and who, in the older terminology, were called either necessary or indispensable parties. Assuming the existence of a person who should be joined if feasible, the only further question arises when joinder is not possible and the court must decide whether to dismiss or to proceed without him. To use the familiar but confusing terminology, * * * the decision to dismiss is a decision that he is "indispensable."

*Id.* at 118, 88 S.Ct. at 742.

This court has held, in cases prior to the adoption of Rule 19, that a court cannot proceed without an indispensable party, *C. de Baca v. Baca*, 73 N.M. 387, 388 P.2d 392 (1964), because the absence of such a party raises a question as to the court's jurisdiction to hear the case. *State ex rel. Clinton Realty v. Scarborough*, 78 N.M. 132, 429 P.2d 330 (1967); *State Game Comm'n v. Tackett*, 71 N.M. 400, 379 P.2d 54 (1962); *Sellman v. Haddock*, 62 N.M. 391, 310 P.2d 1045 (1957); *Keirsey v. Hirsch*, 58 N.M. 18, 265 P.2d 346 (1953).

■ Thus, failure to join an indispensable party renders the suit defective. *Richins v. Mayfield,* 85 N.M. 578, 514 P.2d 854 (1973). Rule 19 does not expressly state whether such an inability to proceed is a jurisdictional defect, but we have consistently held that it is. E. g., *Perez v. Gallegos,* 87 N.M. 161, 530 P.2d 1155 (1974); *Richins v. Mayfield,* supra.

*The United States as an Indispensable Party*

■ Defendant was granted summary judgment by the trial court, one of the stated reasons being that the United States is an indispensable party. Defendant argued to the court below that the United States is the owner of the water and must be a party to the suit, but has not consented to be sued. This reasoning is not well-founded. The Reclamation Act declared that irrigation water is appurtenant to the land which is being irrigated and states that "beneficial use shall be the basis, the measure, and the limit of the right." 43 U.S.C. § 372 (1970). The same language is employed in N.M.Const. art. XVI, § 3, and in § 75–1–2, N.M.S.A.1953. The water was not appropriated for the use of the government but for the use of the landowners. The government was only a carrier or a trustee for the owners. *Ickes v. Fox,* 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937). This principle was affirmed by the U. S. Supreme Court in *Nebraska v. Wyoming,* 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945) in which the court stated:

The property right in the water right is separate and distinct from the property right in the reservoirs, ditches or canals. The water right is appurtenant to the land, the owner of which is the appropriator. The water right is acquired by perfecting an appropriation, i. e., by an actual diversion followed by an application within a reasonable time of the water to a beneficial use.

Id., 325 U.S. at 614, 65 S.Ct. at 1349.

Our court has stated that the waters are appurtenant to the land and that the district only stores and delivers them to the users. *Middle Rio Grande Water Users Ass'n v. Middle Rio Grande Conservancy Dist.,* 57 N.M. 287, 258 P.2d 391 (1953). In *State v. McLean,* 62 N.M. 264, 308 P.2d 983 (1957) this court held that water belongs to the state which authorizes its use. The use may be acquired but there is no ownership in the corpus of the water.

Summary judgment against Landowners for not joining the United States as a party, based solely on the theory that the government owned the water, would be error.

Landowners contend that this court is precluded from considering the Mexican Treaty in determining whether or not the United States is an indispensable party because the issue has been raised for the first time on appeal and the trial court was not alerted to this claim. However, the treaty was placed in evidence by Landowners.

■ The U.S.Const. art. VI, cl. 2 provides that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land;" and that "the Judges in every State shall be bound thereby . . . ." Because of our constitutional provision, a U.S. treaty is regarded in this country not as a mere contract between nations but as part of the supreme law of the land. *United States v. Rauscher,* 119 U.S. 407, 418–419, 7 S.Ct. 234, 30 L.Ed. 425 (1886); *Head Money Cases,* 112 U.S. 580, 58 S.Ct. 247, 28 L.Ed. 798 (1884); *Foster v. Neilson,* 27 U.S. (2 Pet.) 164, 201, 7 L.Ed. 415 (1829).

■ Since treaties are the supreme law of the land, judges in all courts of this country are "*bound* to take judicial notice [thereof]." *Rauscher,* supra, 119 U.S. 419, 7 S.Ct. 240 (emphasis added), *see Valentine v. United States,* 299 U.S. 5, 11, 57 S.Ct. 100, 81 L.Ed. 5 (1936); *Asakura v. Seattle,* 265 U.S. 332, 341, 44 S.Ct. 515, 68 L.Ed. 1041 (1924).

"Treaties are the supreme law of the land and the courts must take judicial knowledge thereof and of the historical data leading up to them, as well as the construction of them by both the executive and judicial branches of the government." *San Lorenzo Title & Improv. Co. v. Caples,* 48 S.W.2d 329, 331 (Tex.Civ.App.1932); 29 Am.Jur.2d Evidence § 33 (1967).

■ An appellate court can properly take judicial notice of any matter of which a court of original jurisdiction may properly take notice. *Landy v. FDIC,* 486 F.2d 139 (3d Cir. 1973) cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1973); *Nev-Cal Elec. Sec. Co. v. Imperial Irr. Dist.,* 85 F.2d 886 (9th Cir. 1936), cert. denied, 300 U.S. 662, 57 S.Ct. 493, 81 L.Ed. 871 (1936).

■ We take judicial notice of the Mexican Treaty and consider whether the obligations of the United States under that document makes the government an indispensable party. The same general principles apply as to the *Rio Grande Compact,* supra, which instrument was not called to the attention of the trial court or of this court on appeal. However, we take judicial notice of this document also, pursuant to N.M. R.Civ.P. 44(d) [§ 21–1–1(44)(d), N.M.S.A. 1953], since it is a part of the statutory law of New Mexico. Section 75–34–3, N.M.S.A. 1953.

■ In *New Mexico v. Backer,* 199 F.2d 426 (10th Cir. 1952) the acting construction engineer in charge of EBID and employees of the Bureau were sued by the State and City of Truth or Consequences to enjoin them from reducing the water level of the reservoir to a point that would destroy the fish and create a health menace to the people of Truth or Consequences. The de-

fendants claimed that the action should be dismissed for the reason that it was a suit against the United States and that the Secretary of Interior was an indispensable party.

The court outlined the general history of the *Rio Grande Project* and stated:

Thereafter the United States constructed plants on the project for the generation of electric power and the districts, in consideration of a reduction of project costs chargeable to them, conveyed to the United States all their right, title and interest in the use of the dam and other project works including the project water supply for the development of electricity. The United States had entered into numerous contracts for the sale of electric power which was developed on the project. The entire irrigation works, together with the power installations and transmission lines, were owned and operated by the United States. Backer was an officer of the United States in charge of all of the installations. There is no suggestion in the pleadings or the evidence that his duties were not those prescribed by the United States in conformity with valid statutes. Part of his duties was the release of water from the reservoir to meet the obligations of the United States for the supply of irrigation water and electricity, and to meet the treaty obligations of the United States with the Republic of Mexico. We have no doubt but that the enjoining of government officials in this case interferes with the management and control of property of the United States and raises questions of law and fact upon which the United States would have to be heard.

Id. at 427.

The court ruled that if the flow of the water could be enjoined by court decree directed to the engineer in charge, he would be under the direction of the court and not his superiors as representatives of the United States. It would be a complete ouster of the United States over the control and management of its own property and facilities.

The court in *Backer* distinguished *Ickes v. Fox,* supra, heavily relied upon by Landowners in this case, and stated that a reading of *Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) clearly indicates that the Supreme Court held that the theory of *Ickes* must be rejected insofar as it applies to injunctive relief against a public official under those circumstances. The court affirmed the trial court's dismissal of the suit.

Although the factual situation in *Backer* is not the same as that in the instant case, the reasoning behind the decision in *Backer* applies equally well to our case where Landowners are attempting to validate unauthorized appropriations of water which affect the obligations of the United States in its administration of the *Rio Grande Project* and its delivery of water to Mexico. Questions of law and fact are raised upon which the United States would have to be heard.

*El Paso County Water Impr. Dist. No. 1 v. City of El Paso,* 133 F.Supp. 894 (W.D. Tex.1955) involved a number of issues present in our case. The Board of Water Engineers of Texas had granted El Paso a permit to appropriate 27,000 acre-feet of water from the Rio Grande. The water district contested the appropriation on the grounds that El Paso was not entitled to take water that was already appropriated for use of the Rio Grande Project, of which the City was not a part. The City argued that it was entitled to the water because of riparian rights, which legal theory is partially recognized in Texas, and by right of prior appropriation.

The court held that a water right, unlike a fee simple title, is not a fixed and absolute estate, but, instead, "is a defeasible interest, which never comes to rest, but is always at the risk of loss by unjustifiable delay in making or continuing beneficial use thereof. These water rights, however, [sic] denominated, in any event, are subject to the restraints in the Reclamation Act * * *" Id., 905. The court recognized that the Reclamation Law specifically prohibits the disturbance of state authority

and that the federal government "shall proceed in conformity with such [state] laws." Id., 904 [43 U.S.C. § 383 (1970)]. However, the court attached significance to the fact that the water district had contracted an indebtedness to the United States which called for orderly self-liquidation. The court reasoned that inroads in the name of a higher priority, claimed by El Paso under the terms of Texas law, might substantially deplete the water for irrigation in the district which "might well hinder or disrupt the entire project." Id., 906. The court stated:

> The Republic of Mexico, as well as the United States, has interests at stake. The Rio Grande has been the subject of Conventions and Treaties between these nations. * * * In short, Texas does not and cannot have a free hand with this particular river.

Id., 906–907.

The court called attention to what it characterized as "a number of peculiar provisions" in the *Rio Grande Compact* among the states of New Mexico and Texas. The water owed to Texas by New Mexico is to be delivered at Elephant Butte Reservoir, one hundred miles above the point where the Rio Grande leaves New Mexico, not at the mutual state lines. The compact does not leave the Texas share of the water open for disposition under the general water statutes of Texas, it plainly directs that the water is for irrigation in the project. The project lands are in New Mexico and Texas with the water being used to irrigate lands in both states in the project. The court stated:

> The apparent reason for all this is that when the Compact was negotiated, the Rio Grande Project, in all of its far flung works and physical properties was, and for some time had been superimposed on the Rio Grande and its adjoining valleys all the way from the Elephant Butte Reservoir in New Mexico, to a point below Fabens in Texas and that fait accompli colored the whole Compact. * * *
> In any event, an analysis of the Compact shows convincingly that the water be-

longing to Texas is definitely committed to the service of the Rio Grande Project. This Compact is binding on Texas and the defendant City and, for that matter, is binding on the inhabitants and citizens of Texas.

Id. at 907.

The court held that the City's claims must yield to the paramount disposition made by the Rio Grande Compact. Although the United States was joined as a party plaintiff in this action, the reasoning of the court nevertheless has some applicability to our case and is persuasive. The Landowners are in a comparable position with the City of El Paso in that they are asserting claims to water already appropriated for EBID. To grant Landowners water rights might hinder or disrupt the project and interfere with the fulfillment of the federal government's obligations.

The Mexican Treaty came under view in another EBID case, *EBID v. Gatlin,* 61 N.M. 58, 294 P.2d 628 (1956). The district attempted to enjoin subordinate officials of the Department of Interior from diverting Rio Grande water to Bosque del Apache Refuge and Wild Life Reserve. The court called attention to the fact that the game refuge had been lawfully established in aid of treaties with Mexico for the delivery of irrigation water and with Great Britain and Mexico with regard to the protection of migratory birds. The court held that the game refuge, the title to which was in the United States, could not be operated without the use of the water in question. The opinion quoted extensively from *Becker* and held that a judgment would expend itself upon the United States, its properties and administration and that the United States was an indispensable party. The case was ordered dismissed.

There is no material difference in the facts in *EBID v. Gatlin* and our case, except that the facts in the latter instance give more support to the necessity of the United States being a party.

Determination of whether the federal government is an indispensable party depends to some extent upon the presence of

federal questions in the case. A number of cases have addressed this issue regarding the Reclamation Act and furnish some direction for a decision in our case.

In *El Paso County Water Impr. Dist. No. 1 v. City of El Paso,* supra, the City was attempting to appropriate river waters from the Rio Grande, the distribution of which water was covered by a water-use compact executed by the three states through which the river runs. The court ruled that this presented a federal question.

The case of *Yellen v. Hickel,* 352 F.Supp. 1300 (S.D.Cal.1972) in the United States District Court for the Southern District of California considered questions of considerable interest in connection with the instant case. Plaintiffs who were residents of the Imperial Valley brought suit against the Secretary of Interior to mandamus enforcement of Section 5 of the Reclamation Law of 1902. 43 U.S.C. § 431 (1970). They were attempting to enforce the requirement in that section that water users be residents. The court held that this involved the interpretation of a federal statute and that it was therefore a federal question, stating that federal courts are not bound by state court precedent on federal questions.

The defendant landowners in *Yellen* contended that Section 5 imposed only a "threshold requirement;" not a "durational requirement." A "threshold" requirement would, in effect, be an initial prerequisite to the receipt of water right and would terminate upon the water right being granted rather than continuing on in duration. The court held that the policy of the Reclamation Law would best be advanced by imposing a durational residency requirement even after the construction costs have been paid, stating that the holder of a water right does not own any water and that "the use of the water, can be, and most always is, subject to state and federally imposed conditions." 352 F.Supp. at 1306. The court stated further:

> An appropriative water right is a usufructuary right. The holder of the right has the privilege of enjoying a thing (water) the property of which is vested in

another (the state). A water right, which is in the nature of a privilege, can be made conditional upon continued residence.

Id., 1307.

The court reasoned that if the Imperial Valley landowners wished to evade the strictures of the Reclamation Law, they were free to turn to their water rights which allegedly existed prior to the organization of the district. Attention was called to the case of *Arizona v. California,* 376 U.S. 340, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964) in which the U. S. Supreme Court had issued a decree requiring the landowners in the Imperial Valley to submit their Colorado River water claims through the State of California and then have them acknowledged by the Secretary of Interior. The court stated that this question had been pre-empted by the Supreme Court and should not be subject to determination by a lower court, and stated:

> [P]re-project water rights are irrelevant because it need only be shown that the Imperial Irrigation District is deriving a benefit from the use of a government facility for reclamation law to be applicable. Therefore, even if landowners comply with the *Arizona v. California* decree and have their rights acknowledged, they will still have to comply with the reclamation law.

352 F.Supp. at 1310.

The court held that Section 5 was not an administrative regulation and subject to interpretation but that it was "an expression of national policy," and that it had been national policy for over a half century. The ruling was that there was no discretion left in the Secretary of Interior in the enforcement of Section 5 but that the language was mandatory.

In *Yellen* the court relied on the decision in *Evanhoe Irrigation District v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) in which it was similarly held that the application of the one-hundred-sixty acre limitation on the lands irrigated of the same Section 5 to individual landowners in the Central Valley of California was a

**406**

durational restriction that was to be enforced by the Secretary of Interior, whereas in *Yellen* the question involved the residency requirement of that section.

In *Ivanhoe*, the Supreme Court stated that the rights and duties of the United States under Reclamation contracts are matters of federal law in which that court had the final word, and that Section 8, supra, providing that state laws shall govern, merely requires the United States to comply with state law when, in the construction and operation of the Reclamation Project, it becomes necessary for it to acquire water rights. The court stated that the acquisition of water rights must not be confused with the *operation of federal projects* and held that Section 5 "is a specific and mandatory prerequisite laid down by the Congress." Id. at 291, 78 S.Ct. at 1184.

Of some interest in our case is a third clause in Section 5, presumed to be mandatory under the above decisions, which will ultimately be material in the resolution of the issues between the parties. In addition to the restrictions on residency and acreage, the law specifies that no water right "shall permanently attach until all payments therefor are made." 43 U.S.C. § 431 (1970). The record shows that Landowners have made no payments for the water received. They have never filed a petition with EBID to have their land included in the district as mandated by § 75–22–36, N.M.S.A.1953, an applicable law. They have not made any payments on construction charges. 43 U.S.C. § 477, et seq. (1970). There is no evidence of any effective compliance with a multitude of state and federal laws that govern entry into the district and retention of water rights.

For all the reasons set forth herein we hold that the United States is an indispensable party to this action. Since the federal government has not consented to be sued, we remand the case to the trial court with instructions that the cause be dismissed. We do not reach other issues raised.

IT IS SO ORDERED.

SOSA and PAYNE, JJ., concur.