Ben **YELLEN** et al., Plaintiffs,

v.

**Walter J. HICKEL, Individually and as Secretary of the Interior, et al., Defendants,**

**W. E. Jacobs et al., Intervening Landowners.**

**Civ. No. 69–124.**

United States District Court,
S. D. California.

Sept. 27, 1972.

Arthur Brunwasser, San Francisco, Cal., for plaintiffs.

William R. Klein and Douglas N. King, Dept. of Justice, Washington, D. C., for defendants.

Charles W. Bender, Patrick Lynch and James Selna, Los Angeles, Cal., and Harry D. Steward, U. S. Atty., San Diego, Cal., for intervening defendants.

## OPINION

WILLIAM D. MURRAY, Senior District Judge.

Plaintiffs brought this suit seeking a writ of mandamus requiring the Secretary of the Interior to enforce Section 5 of the Reclamation Law of 1902.[1] On November 23, 1971, a partial summary judgment was issued against the federal government,[2] the initial defendants in the suit. The landowners of Imperial Valley, believing that their interests were not sufficiently protected by the government, requested and were granted permission to intervene on their own behalf. A full trial on the merits was then held. All parties have submitted post-trial briefs and the court has reconsidered its partial summary judgment. Now, in light of the testimony and evidence produced at trial, the court reaffirms its partial summary judgment and makes its final determination.

The issues being reconsidered are: (1) the issues of standing and res judicata, (2) the scope of Section 5 of the 1902 Reclamation Act (the residency requirement), (3) the effect of the Boulder Canyon Project Act (hereinafter referred to as the B.C.P.A.) on the Imperial Valley, (4) the rule of Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed. 2d 616 (1965) which requires deference to longstanding administrative constructions, and (5) the equal protection argument.

## STANDING AND RES JUDICATA

■ The plaintiffs in this suit do have an interest in having Section 5 residency requirement enforced. Section 5 is directed specifically to the provision of water for settlement of individuals upon the land. The plaintiffs, residents of Imperial Valley, are clearly within the general zone of interest that is sought to be protected by this legislation.[3] Landowner defendants would have the court believe that only those "directly" affected have standing and that, conveniently, they are the only ones who will be "directly" affected. Obviously the landowners, the beneficiaries of the present state of affairs, are not going to press for enforcement of Section 5. If the plaintiffs are not granted standing to bring this suit, the Department of Interior will in effect be given a license to disregard the law, as well as an immunity from challenges by

1. 43 U.S.C. § 431. No right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one landowner, and no such sale shall be made to any landowner unless he be an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of said land, and no such right shall permanently attach until all payments therefor are made. June 17, 1902, c. 1093, § 5, 32 Stat. 389.

2. Yellen v. Hickel, D.C., 335 F.Supp. 200 (1971).

3. Judge Schwartz, who originally was sitting on this case, denied the government-defendants' motion to dismiss for lack of standing. A written order was signed June 30, 1970. In ruling that the plaintiffs have standing, Judge Schwartz said:

"Without prejudging the results of the lawsuit, it does appear to me that the Plaintiffs in this case do have an interest of some kind in having the law enforced —that is, the residency requirement enforced. It may be that in the end their interest will not be served by the result that they hope for. Nevertheless, they do have an interest. They seem to come within the general zone of the interest that is sought to be protected by the legislation. The legislation seems directed specifically to the provision of water for settlement of individuals directly upon the land. So it will be the ruling of the court that the Plaintiffs do have standing to prosecute this action, and, accordingly, the Motion to Dismiss for lack of subject matter jurisdiction will be denied." (Transcript of Proceedings, June 12, 1970, pp. 27–28).

the intended beneficiaries of the legislation in question.[4]

The decision of Hewes v. All Persons [5] decided by the Superior Court for Imperial County is not res judicata as to this cause of action. The case was originally commenced to confirm the proceedings on the part of the Imperial Valley Irrigation District for the authorization of the execution of the contract with the United States. At the same time, a landowner in the District, Charles Malan, filed an action in the same court to enjoin the District from expending any more money in furtherance of the contract. Malan alleged the invalidity of the contract, in part, because of Malan's contention that Section 5 of the Reclamation Law of 1902 would apply under the contract and control over its terms, thus taking, without compensation, his water rights for all of his land in excess of 160 acres.

The Malan action was consolidated with the District's confirmation action. On July 1, 1933, judgment was entered confirming the validity of the contract. In its opinion the court held that Section 5 of the Reclamation Law did not apply to the contract.

43 U.S.C. § 511 [6] gives the state courts the power to confirm "proceedings on the part of the district for the authorization of the execution of the contract with the United States." The jurisdiction of the state court is delineated by this statute. The statute confers no jurisdiction upon the state court to decide, as was done in Hewes v. All Persons, whether Section 14 of the B.C.P.A. ("reclamation law shall govern the construction, operation and maintenance") incorporates Section 5's acre and residency limitations. The precise question of whether the term "construction, operation and maintenance" includes the delivery provisions of Section 5 has been decided by the United States Supreme Court in Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1957), and the decision is contrary to the dicta in Hewes, supra.

Plaintiffs are not estopped by a decision rendered at a time when plaintiffs surely would not have been granted standing to contest the issue. Nor are they estopped by a state court decision which is contrary to a subsequent Supreme Court determination of the question.

The question of whether or not Section 5 applies to the Imperial Valley involves interpretation of a federal statute and is therefore a federal question. Federal courts are not bound by a state court precedent on federal questions.

"It was upon a determination of a federal question, therefore, that the Supreme Court of California rested its conclusion that, by Section 10, sales to post exchange were not exempted from the tax. Since this determination of a federal question was by a state court, we are not bound by it." Standard Oil Co. v. Johnson, 316

4. See Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 292, 78 S.Ct. 1174, 1184, 2 L.Ed.2d 1313 (1957). "From the beginning of the federal reclamation program in 1902, the policy as declared by Congress has been one requiring that the benefits therefrom be made available to the largest number of people, consistent, of course, with the public good."

5. Hewes v. All Persons, No. 15460 Dept. 2, Superior Court of the State of California in and for the County of Imperial. May 24, 1933.

6. 43 U.S.C. § 511. In carrying out the purpose of the Act of June 17, 1902, and Acts amendatory thereof and supplementary thereto, and known as and called the reclamation law, the Secretary of the Interior may enter into contract with any legally organized irrigation district whereby such irrigation district shall agree to pay the moneys required to be paid to the United States . . . : Provided, That no contract with an irrigation district under this section and sections 512 and 513 of this title shall be binding on the United States until the proceedings on the part of the district for the authorization of the execution of the contract with the United States shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid.

U.S. 481, 483, 62 S.Ct. 1168, 1169, 86 L.Ed. 1611 (1941). See also 20 Am. Jur. Courts § 222.

## THE SCOPE OF SECTION 5

██ Landowner defendants along with the government contend that Section 5 does not apply in a situation in which there has been no "sale", nor does it apply in a situation where an "irrigation district" is involved in lieu of "individual landowners"—the term used in Section 5. Also, they contend that Section 5 imposes only a threshold requirement; not a durational requirement. A "threshold" requirement would, in effect, be an initial prerequisite to the receipt of a water right as herein defined. The requirement would terminate upon granting of a water right rather than continuing on in duration. The suggested threshold periods are either five years or the period of time needed for the irrigation district to repay the government for its capital investment in the irrigation project (the year 2002 in the case of the Imperial Valley Irrigation District).

### What is a "Sale"

The United States Supreme Court has answered both of the questions posed by landowners in its decision of Ivanhoe v. McCracken, *supra*. The question before the court in *Ivanhoe* involved the application of the 160 acre limitation of Section 5 to individual landowners in Central Valley. The *Ivanhoe* case differs from this case only in that it involves the 160 acre limitation of Section 5 rather than the residency requirement. The case is analogous in that it involves a "district" and in that the "no sale" prohibition pertains to both the acreage and the residency requirements.

The landowners are quick to point out that Congress has reenacted the acreage limitation many times while failing to mention the residency requirement.[7] Landowners would have the court believe that this history of reenactment of the acreage limitation explains the Supreme Court's holding in *Ivanhoe*. In support of their specious reasoning, the landowners quote Mr. Justice Clark when he alludes to "§ 5 of the Reclamation Act of 1902, as reenacted in § 46 of the Omnibus Adjustments Act of 1926."[8] Were the landowners' attorneys to read the substance of Justice Clark's opinion rather than his mere paraphrasing of counsel's argument, they would find that the decision turned on the 1902 Act alone, thus vitiating the import landowners attach to the Acts of 1912 and 1926.[9] The Supreme Court in *Ivanhoe* held the 160 acre limitation applicable to the Central Valley even though the only "sale" involved consisted of a contract[10] between the irrigation company and the government by which the irrigation district agreed to repay the construction costs of the project. The Imperial Valley has a contract with the federal government essentially the same as the one in *Ivanhoe*. The "sale" to the Imperial Valley Irrigation District is the same as the "sale" to the Ivanhoe Irrigation District. Section 5 was found applicable to the Ivanhoe Irrigation District and should be equally applicable to the Imperial Valley contract.

### "Districts" as against "Individual Landowners"

The Supreme Court in *Ivanhoe* held that "where a particular project has been exempted (from reclamation law) because of its peculiar circumstances, the Congress has always made such exemptions by express enactment".[11] Finding no specific exemption, the court applied Section 5 to the Central Valley landowners regardless of the fact that the landowners had formed a "district"

---

7. *See* 43 U.S.C. §§ 543, 544, Aug. 9, 1912 and 43 U.S.C. § 423e, 1026, *e. g.*

8. *Ivanhoe, supra*, note 6, 357 U.S. at 289, 78 S.Ct. at 1182.

9. *Id.* at 291–294, 78 S.Ct. 1174, 2 L.Ed. 2d 1313.

10. *Id.* at 277 and footnote #1, 78 S.Ct. 1174.

11. *Id.* at 292, 78 S.Ct. at 1184.

and Section 5 makes no mention of "districts". This holding is completely compatible with the policy of Section 5 as seen by the court:

> "The policy as declared by the Congress has been one requiring that the benefits therefrom be made available to the largest number of people, consistent, of course, with the public good. This policy has been accomplished by limiting the quantity of land in a single ownership to which project water might be supplied." [12]

Residency, the companion requirement of the 160 acre limitation, will also further the policy of making the benefits from the act available to the largest number of people. The formation of "districts" is merely for administrative expediency. It is not meant to thwart the policy of Section 5.

## "Durational or Threshold"

Section 5 does not limit residency to a threshold requirement as defined *supra,* pages 4–5. To so limit it, would be contrary to the whole tenor of Reclamation Law. No conceivable purpose would be served by freeing the landowners from this requirement after they have acquired the immense benefits of

the federal subsidy. The law was not intended to provide supplemental income to former residents who have returned to San Diego, Burbank and other locations far removed from the Reclamation project. Accordingly, the residency requirement should not be waived upon final payment of construction costs of the project. Such a practice would reduce the statutory limitations to a mere sham. Section 5 would then be nothing more than a financial test tailored to suit the more affluent who can afford to accelerate their payments, move off the project and reap the benefits of a federal subsidy.[13] The policy of the Reclamation Law will best be advanced by imposing a durational residency requirement upon recipients of water from federal projects, even after the construction costs have been paid.

A durational residency requirement to the receipt of water does not fly in the face of the "water right" concept. A water right is not as inviolable as a fee simple in land. The holder of a water right does not own any water, he merely holds a right to the "use" of that water. The use of the water, can be, and most always is, subject to state and federally imposed conditions. For example, most

---

12. *Id.*

13. *But see,* Solicitor Bennett's Opinion on the Kings River Contract, July 10, 1957: "You have requested my opinion concerning your (the Dept. of Interior) authority under Federal reclamation law to agree to provisions in the proposed contract with the Kings River Conservation District whereby *individual holders* of excess lands will be permitted to pay the reimbursable costs allocable to their excess holdings and thereby be relieved from the limitations on supplying water to excess lands and the consequences of the antispeculation features of the recordable contracts required by law . . . My opinion is that Congress has not granted to you such authority. Further, fiscal desirability, no matter how impelling, does not suffice as a substitute for that statutory power." (emphasis added) Plaintiffs' Exhibit #28.
Secretary Seaton's letter concerning the Kings River Contract, July 12, 1957.

"The Department continues to recognize and support the basic concept of reclamation law that full and final payment of the obligation of a *district* to the Federal Government ends the applicability of the acreage limitations . . . In the Kings River situation, the proposed options of repayment, extended to each water user, would reduce the statutory limitation to a mere shadow. This would make the test, not one of public policy, but solely one of the financial capability of each landowner to purchase immunity from the statutory restrictions." (emphasis added) Plaintiffs' Exhibit #27.
Secretary Seaton fails to recognize that termination of the acreage limitation upon full payment, regardless of whether payment is by individuals or district, "reduces the statutory limitation to a mere shadow" making the test one of financial capability of the individual or the district. If anything, it becomes more of a shadow when *districts* are involved because of the greater financial resources and ability to raise money.

state water rights are conditioned on their being put to a "beneficial use." If they are not put to a beneficial use, they can be forfeited.

■■ An appropriative water right is a usufructuary right.[14] The holder of the right has the privilege of enjoying a thing (water) the property of which is vested in another (the state). Holders of land patents, on the other hand, have fee simple titles vested in them. State imposed conditions present a much greater constitutional problem in the context of land holdings than in the context of water rights because of the situs of the title. This is basically why water rights lend themselves to the continued implementation of reclamation policy. A water right, which is in the nature of a privilege,[15] can be made conditional upon continued residence. Such a durational requirement would not be possible with land, however. It would be contrary to the vesting of a fee simple title. This explains the use of "threshold" requirements with land patents. Once the threshold requirement is met, the conditions cease and the title vests in the entryman. The landowners fail to make this distinction between land and water rights when they cite the Small Tract Act of 1950 and the Farm Unit Exchange Act of 1953 as being examples of Congress' intent that residency be only a threshold requirement to receipt of water. These two Acts deal with land, not water. Consequently, they are not persuasive as to Section 5 being durational

or threshold. They are, however, indicative of Congress' intent to benefit only "residents" of the land.[16] They reaffirm the basic policy of the Reclamation Law.[17]

## THE BOULDER CANYON PROJECT ACT

■ The landowners claim that the B.C.P.A. precludes any application of Section 5 to the Imperial Valley. For support they rely essentially on Section 14 of the B.C.P.A. which states: "[general] reclamation law shall govern the construction, operation, and management of the works herein authorized, except as otherwise herein provided." and Sections 6, 8 and 13 which incorporate the Colorado River Compact which in turn recognizes "present perfected rights." [18]

It is the position of the government that reclamation projects constructed pursuant to the B.C.P.A. are governed by Section 46 of the Omnibus Adjustments Act of 1926, 43 U.S.C. § 423e. The Omnibus Adjustments Act carries forth the acreage limitation but makes no mention of the residency requirement.

Landowners point out that Section 14 refers to "construction, operation and management." No reference is made to "delivery." Section 5, however, is aimed at "delivery." The landowners reason that Section 5 is, therefore, not incorporated by Section 14 of the B.C.P.A. In light of the *Ivanhoe case, supra,* their argument must fail.

14. Amador County v. State Bd. of Equalization, 240 Cal.App.2d 205, 49 Cal.Rptr. 448, 457.

15. United States v. Willow River Company, 324 U.S. 499, 509, 65 S.Ct. 761, 89 L.Ed. 1101 (1945).

16. See Under Secretary Oscar Chapman's letter to Senator O'Mahoney: "The purpose of S. 1543 is to allow the disposal to *resident* landowners and entrymen on reclamation projects of small tracts of lands which are not suitable for disposal under the homestead or reclamation law. . . . The sale of such tracts to *those farmers located on the project* would be in the interest of the project and

would place the lands on the county tax rolls." U.S.Code Congressional Service, Vol. #2, 1950, pp. 1997–8. (emphasis added).

17. *Ivanhoe, supra* note 6, 357 U.S. at 292, 78 S.Ct. 1174, 2 L.Ed.2d 1313.

18. The Colorado River Compact, provides in Article VIII that: "Present Perfected Rights to the beneficial use of water of the Colorado River System are unimpaired by this Compact. Whenever storage capacity of 5,000,000 acre feet shall have been provided . . . such rights . . . shall attach to and be satisfied from water that may be stored . . . . "

The *Ivanhoe* case dealt with the Central Valley Project in California. The language of the Central Valley Project Act [19] is essentially the same as Section 14 of the B.C.P.A., *i. e.* except as herein otherwise provided, the reclamation law shall govern the "construction, operation and management". In finding that the 160 acre limitation applied to Central Valley contracts, the Supreme Court in *Ivanhoe* found that the water delivery provisions of Section 5 were included within the ambit of "construction, operation and management" as used in the Central Valley Project Act. The same must hold true for the incorporation statute (Section 14) of the B.C.P.A.

 Both defendants (landowners and the government) then contend that Section 1 of the B.C.P.A. falls within the "except as otherwise provided" language of Section 14. Section 1 states that no "charge" shall be made for water. This, defendants claim, runs contra to the "sale" language of Section 5 and thus precludes incorporation of Section 5. Defendants misconstrue the term "sale". Section 5 must be read in conjunction with Section 4. Former Solicitor of the Department of Interior, Frank Barry, suggested that a reading of the two sections together reveals that the "sale" is not a commercial transaction. Rather, "Sections 4 and 5 disclose a scheme by which all participants in a project share its costs" [20] by contracting to repay, over an extended period of time, the government expense of constructing the project, *i. e.* the capital outlay. There is no inherent inconsistency between Section 5 of the 1902 Act and Section 1 of the B.C.P.A. which would prevent Section 14 of the B.C.P.A. from incorporating the residency requirement.

## THE COLORADO RIVER COMPACT

Landowners' next contention is that the B.C.P.A. states in §§ 6, 8 and 13 that the "storage, delivery and use" of irrigation water shall be subject to and controlled by the Colorado River Compact.[21] Article VIII of the Colorado River Compact says:

"Present Perfected Rights to the beneficial use of water of the Colorado River System are unimpaired by this Compact. Whenever storage capacity of 5,000,000 acre feet shall have been provided . . . such rights . . . shall attach to and be satisfied from water that may be stored."

Landowners reason that they were owners of perfected water rights and that mandatory satisfaction of those rights is incompatible with denial of water because of a landowner's place of residence. This argument fails for any one and all of four reasons.

To begin with, there is no evidence that the landowners were owners of perfected water rights as of 1929, the effective date of the Compact. The stipulation of facts and the landowners' Exhibit #1 reveal that the landowners filed water right claims to the Colorado River prior to 1900. In 1903, the Hanlon heading intake in California became clogged with silt.[22] The landowners, at this time, were also having trouble with the newly formed Bureau of Reclamation whose engineers had attacked the California Development Company's right

---

19. 50 Stat. 850.

20. M–36675, 71 I.D. 496, at 501 (1964).

21. Boulder Canyon Project Act § 6 (43 U.S.C. § 617e). The dam and reservoir provided for by section 617 of this title shall be used: First, for river regulation, improvement and navigation, and flood control; second, for irrigation and domestic uses and *satisfaction of present perfected rights* in pursuance of Article VIII of said Colorado River compact; (emphasis added)

22. Stipulation of Facts, p. 7, paragraph 7. "Hanlon's heading, the first intake cut by the California Development Company, became clogged with silt by 1903. In or about 1903, the Mexican company was granted a concession by the Republic of Mexico which permitted it to divert water from the River *in Mexico* and deliver half of that water at an inland point on the international border for use in Imperial Valley. Second and third headings, situated *south of the border*, were built in 1904." (emphasis added)

to take water from the Colorado,[23] a navigable river. There is no evidence that Congress, prior to the B.C.P.A., ever authorized the Imperial Valley landowners to use the navigable waters of the Colorado. The landowners then attempted to skirt the problem by requesting Congress to declare the Colorado to be non-navigable and thus beyond federal jurisdiction. Congress rejected this request.[24]

As a result of the silt problem and Reclamation's challenge, the California Development Company apparently turned to Mexico for its diversions.[25] There is no evidence that the landowners, the California Development Company, or the Imperial Valley Irrigation District ever diverted water from the Colorado in the United States after 1903. Although we make no factual finding in this regard, it appears that at the time of the authorizing of the All-American Canal, the landowners were still relying on Mexican water rights— not perfected American rights.[26]

■ Secondly, assuming the landowners do have perfected United States water rights, they are free to make use of *those* water rights, *i. e.* they are free to make use of their original diversions in lieu of using B.C.P.A. water. However, if the landowners opt to use B.C.P.A. water, they must satisfy the conditions of delivery. The B.C.P.A. recognition given to "present perfected rights" is a limited recognition. Holders of perfected rights, choosing to use B.C.P.A. water must, like everyone else, comply with the acreage and residence requirements of the Reclamation Law.

■ The superior navigation easement of the United States precludes

23. "The diversion of water from the Colorado River was made through three intakes, one in California, and the other two in Lower California or Mexico. Intake No. 1 was commenced in October, 1900. The first water distributed or used for irrigation was drawn through this intake and carried by canal and the channel of the Alamo river through Mexican territory back to the international boundary line in the neighborhood of Calexico, where the first water was delivered to the water companies in California about June 15, 1901. Intake No. 2 was constructed in 1904, and was located just *below the boundary line* in Lower California or Mexico. Intake No. 3 was completed October 6, 1904, and was located about four miles *below the boundary line*, and, like Intake No. 2, was in Lower California or Mexico.

"The witness C. R. Rockwood testified that the reason for cutting intake No. 2 was purely political; *that the right to take water from the Colorado river in the United States had been attacked* by the reclamation engineers. The witness says: We then obtained concessions from Mexico which gave us the right to take water on Mexican soil from the river." The Salton Sea Cases, 9 Cir., 172 F. 792, 810 (1909). (emphasis added)

24. "If this legislation should be enacted, you will have granted away forever the entire magnificent Colorado River." William H. Smythe, Hearing on H.R. 13627, 60; *see* fn. 8. "If the policy of the Gov-ernment is to be sustained and carried out, the Reclamation Bureau will have to take up this enterprise, because the small enterprises will get just enough land in frequent spots and just enough water to make it impossible for the Government to carry out on proper lines what would be absolutely impossible for the individual or corporation here to carry out." Congressman Clarence Van Duzer of Nevada, *Ibid.*, 59.

25. Salton Sea Cases, *supra* note 26. "It is my earnest desire to worship at our own altar and to receive the blessing from the shrine of our own Government, but if such permission is not granted, of necessity I will be compelled to worship elsewhere." Anthony Heber, Hearing on H.R. 13627, 87.

26. The Colorado River Compact, in acknowledging present perfected rights, was obviously ensuring recognition of presently existing rights in the contracting states. The Compact was not concerned with acknowledging Mexican rights although Article III provides for any future recognition of Mexican water rights by the United States: "If as a matter of international comity, the United States of America shall hereafter recognize in the United States of Mexico any right to the .use of any water of the Colorado River system, such water shall be supplied first from the waters which are surplus . . . ."

private ownership of the water or its flow in a navigable stream.[27] Non-recognition of private usufructuary rights is limited to the relationship between the owner and the national government in the exercise of the navigation power. Within that relationship, whatever rights exist, exist by the grace of Congress.[28] The federal government is at liberty to acknowledge private usufructuary rights; likewise it can impose whatever conditions it wishes. Accordingly, the United States Supreme Court told the members of the Ivanhoe Irrigation District that if they chose not to comply with the acreage limitation, they would have to turn to existing water supplies since the excess land law applies to private land within a federal reclamation project without regard to whether those lands are covered by valid water rights prior to the formation of the project.[29] Similarly, if the Imperial Valley landowners wish to evade the strictures of the reclamation law, they are free to turn to their water rights which allegedly existed prior to the B.C. P.A.,[30] regardless of whether those rights are at Hanlon heading in California or below the border, in Mexico.

■ Thirdly, there is no evidence before the court that the landowners ever complied with the decree in Arizona v. Calif., 376 U.S. 340, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964). The decree requires the landowners, through the state of California, to submit their water claims to Colorado River water and have them acknowledged by the Secretary of the Interior.[31] The Supreme Court has preempted the question of perfected rights in the Colorado. The lower courts should not attempt a determination of this issue.

■ Finally, and the government is in total agreement with this reason, pre-project water rights are irrelevant because it need only be shown that the Imperial Irrigation District is deriving a benefit from the use of a government facility for reclamation law to be applicable. Therefore, even if landowners comply with the Arizona v. California decree and have their rights acknowledged, they will still have to comply with the reclamation law.

## EQUAL PROTECTION

■ The landowners raise a Fourteenth Amendment Equal Protection argument claiming that a durational residency requirement would penalize their constitutionally protected right to travel. Landowners cite Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), to support their contention. This court finds that the landowners do not fall within the scope of the Shapiro and Dunn holdings.

The Shapiro and Dunn cases both involve situations wherein a person has moved *into* a jurisdiction and has been denied the rights and/or privileges enjoyed by the established residents of that jurisdiction. Neither case deals with persons who move *out* of a jurisdiction and who are then denied the rights or privileges of that jurisdiction. Shapiro and Dunn involved laws which discriminate between *old* and *new* residents.[32] The two cases say nothing about laws which discriminate between *residents* and *non-residents* as Section 5 does. This is a permissible classification. The logical extreme of landowners' position would allow a person who

27. United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 69, 33 S.Ct. 667, 57 L.Ed. 1063 (1913).

28. Clark, Water and Water Rights, Vol. 2, p. 24 (1967).

29. *Ivanhoe,* supra note 6, 357 U.S. at 286, 78 S.Ct. 1174, 2 L.Ed.2d 1313.

30. See the preceding discussion of the dubious nature of the landowners' claim to perfected United States water rights in the Colorado as of 1929.

31. 376 U.S. 340, 351–352, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964).

32. Dunn v. Blumstein, 405 U.S. 330, 334, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

once resided in Imperial Valley to change his address to New York, for example, and yet still enjoy the benefits of the Imperial Valley's voting and welfare laws. Such a proposition is untenable.

## THE RULE OF TALLMAN v. UDALL

 It was stated in this court's pre-trial summary judgment, 335 F. Supp. 200, 208 (1971): "We cannot accept the contention that administrative rulings—such as those here relied on—can thwart the plain purpose of a valid law. As to estoppel, it is enough to repeat that '. . . the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.'" United States v. San Francisco, 310 U.S. 16, 31–32, 60 S. Ct. 749, 757, 84 L.Ed. 1050 (1939), citing Utah Power and Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791. Although landowners claim that they have not made an estoppel argument, they persistently raise the issues of "economic injury" and "reliance" which are, in essence, estoppel arguments. The principles of equitable estoppel, however, cannot be applied to deprive the public of the protection of a statute because of the non-feasance of public officials. The rule of Tallman, supra, requiring deference to longstanding administrative interpretation, does not apply to the facts of this case. Tallman dealt with the construction of an administrative regulation. Section 5, far from being an administrative regulation, is an expression of national policy. "§ 5, the provisions of which, as we shall see, have been national policy for over half a century." Ivanhoe, supra, 357 U.S. at 292, 78 S.Ct at 1184. In Tallman, the underlying statute behind the regulation left discretion in the Secretary to refuse to issue leases.[33] There is no such leeway in Section 5. Its language is mandatory, not discretionary.

 There is no one consistent administrative interpretation of Section 5 which would warrant application of the Tallman rule. Over the years, the interpretations of Section 5 have been very much in conflict. The landowners rely upon the Wilbur letter;[34] Hewes v. All Persons, supra; and the President's Commission on Water Resources.[35] The plaintiffs rely on Solicitor Barry's opinion[36] as well as Solicitor Harper's opinion.[37] As a consequence of these conflicts, this court must look at the law itself and interpret it consistently with the Supreme Court's holdings in Arizona v. California and Ivanhoe Irrigation District v. McCracken. supra.

Plaintiffs are hereby ordered to prepare an order and mandate in compliance with the court's findings herein.

## FINDINGS OF FACT

and

## CONCLUSIONS OF LAW

This cause came on regularly for trial before the court, sitting without a jury, on April 25 and April 26, 1972; the plaintiffs were represented by Arthur Brunwasser, Esq.; the defendants were represented by William R. Klein, Esq., and Douglas N. King, Esq., of the Department of Justice, and the intervening landowners were represented by Charles W. Bender, Esq., Patrick Lynch, Esq., and James Selna, Esq.; thereupon oral and documentary evidence was introduced by and on behalf of each of the parties, and at the close of all of the evidence the parties rested and thereafter, within the time granted by the court, each of

33. Tallman, 380 U.S. 1, 4, 85 S.Ct. 792, 3 L.Ed.2d 616 (1965).

34. 71 I.D. 529–530.

35. President's Water Resources Policy Commission, Water Resources Law, Vol. 3 (1950).

36. 71 I.D. 496 at 501 (1964).

37. Id. at 533 Appendix II.

the parties filed their briefs and proposed Findings of Fact and Conclusions of Law, and the cause was then submitted to the court for its consideration and decision, and the court having considered all of the evidence and testimony submitted at the trial of the cause and the briefs of counsel, and being fully advised in the premises, now makes and orders filed its Findings of Fact and Conclusions of Law as follows:

## FINDINGS OF FACT

*Parties.*

### I

Plaintiffs are a doctor, an agricultural labor contractor and 121 agricultural laborers who reside in Imperial Valley, California, within the boundaries of Imperial Irrigation District in the neighborhood of land being irrigated by water from the All-American Canal and held in private ownership by non-residents. Most of the plaintiffs are farm workers who are so employed within the boundaries of Imperial Irrigation District and none of the plaintiffs presently own farm land anywhere in the United States, but they desire to purchase land for farms within Imperial Irrigation District, including the lands of non-residents which lands are receiving Boulder Canyon Project water and which lands plaintiffs cannot afford to purchase under present market prices, and ownership.

### II

The persons who occupied the positions of Secretary of the Interior of the United States and lower level officials of the Department of the Interior at the date of the commencement of this action have been substituted as defendants in the capacities indicated with the following statutory duties. Defendant Rogers C. B. Morton is Secretary of the Interior of the United States and is charged with the duty of carrying out the operative provisions of the Reclamation Act of June 17, 1902, and all acts mandatory and supplementary thereto by reason of

Section 10 of the Act of June 17, 1902 (43 U.S.C. § 373). Defendant Ellis L. Armstrong is Commissioner of Reclamation of the United States and is charged with the duty of administering the Reclamation Act under the supervision and direction of defendant Morton pursuant to 43 U.S.C. § 373a. Defendant Edward A. Lundberg is Regional Director of the Bureau of Reclamation of the United States for Region 5 and is in charge of reclamation projects within the territorial jurisdiction of this court.

### III

Intervening as defendants are W. L. Jacobs, Kathryn Farquhar, Dixie Herron, Frank Hertzberg, Alice E. Mamer, Theodore A. Mamer, Kathryn McBurney and William E. Young, Sr., who are all non-residents and owners of irrigable land located within Imperial Irrigation District. Intervention was allowed under Rules 24 and 19 of the F.R.Civ.P. on the basis of the petitioners' allegations that their interests in the delivery of water to the Imperial Valley will not adequately be represented by the Department of Interior.

*Geological Conditions and Background of Reclamation*

### IV

In comparatively recent geologic time, the Gulf of Mexico extended inland to the northwest. Its upper limits reached northward of Indio, California. Through the years, the heavily silt-laden Colorado River deposited sediments and built up a low, flat deltaic ridge entirely across the ancient gulf, cutting off the upper portion from its connection with the ocean. The resulting basin was then an inland sea with a surface area of nearly 2,000 square miles. The greatest depth of this sea was about 320 feet. Deprived of its connection with the Gulf of California, the sea dried up. The northern part of its bed is now known as the Coachella Valley, and the southern part, the Imperial Valley. A portion of this bed dividing the Coachella and Imperial Valleys is known as the Salton

Basin. The Imperial Irrigation District consists, generally, of lands of the Imperial Valley.

### V

In its natural conditions, the entire Imperial Valley region was an unproductive desert. The annual rainfall averages 2 to 3 inches. The Colorado River and the Colorado River Delta east and south of the Imperial Valley are slightly above sea level. From the delta, the land slopes gradually north and west toward the center of Imperial Valley, which is almost entirely beneath sea level. During occasional flooding of the Colorado River, the overflow waters would flow down the slopes of the delta northward into the bottom of the valley and the Salton Basin. Such overflow last occurred in 1905–1907. When such floods occurred, the flood waters would concentrate more or less in depressions and channels leading from the delta region into what is now known as the Salton Sea. These channels or depressions formed natural canals for diversion of the Colorado River's waters into Imperial Valley.

### VI

Due to the sub-level topography of the Imperial Valley, it was recognized as early as the middle of the 19th century that irrigation by means of diversion and gravity flow from the Colorado River was feasible. In 1896, the California Development Company, a privately owned corporation, was organized under the laws of New Jersey for the purpose of diverging water from the river to irrigate arid lands in Imperial Valley and the Republic of Mexico. It was considered necessary at that time, in order to irrigate lands in Imperial Valley, to divert Colorado River water via the bed of an ancient overflow channel known as the Alamo River through Mexico and then back in a northerly direction into the United States.

### VII

Upon a finding by the California Development Company that it could not,

without special permission, purchase the arid lands it intended to irrigate in the Republic of Mexico, it organized a Mexican company in 1898 named La Sociedad de Yrrigacion y Terrenos de la Baja California. The stock of the Mexican company was wholly owned by the California Development Company. In 1900, the Mexican company held title to approximately 100,000 acres of land situated in Baja, California.

### VIII

Water was first diverted from the river through Hanlon's Heading, a temporary diversion point located a few hundred feet north of the Mexican border, into Imperial Valley in July 1901 via Alamo Canal, which followed the bed of the Alamo River.

### IX

Hanlon's Heading, the first intake cut by the California Development Company, became clogged with silt by 1903. In or about 1903, the Mexican company was granted a concession by the Republic of Mexico which permitted it to divert water from the Colorado River in Mexico and deliver half of that water at an inland point on the international border for use in Imperial Valley. Second and third headings, situated south of the border, were built in 1904. The Alamo Canal, from its point of reentry into the United States, as well as the lateral canals through which water diverted from the river was ultimately distributed to land in the Imperial Valley, were owned by seven mutual water companies which were organized by the California Development Company. The stock of the mutual water companies was acquired by the individual landowners to whose land the water was supplied.

### X

By 1903, through the distributive facilities constructed by the local mutual water companies, approximately 25,000 acres of valley lands were in irrigated cultivation, all as a result of diversions from the Colorado River. By the follow-

1314

ing winter, the irrigated acreage was increased to 100,000, mainly in grain. Some 181,191 were irrigated by 1910, 308,009 acres in 1916, and 413,440 in 1919. During the summer of 1904, some water users of Imperial Valley requested the Reclamation Service to consider the purchase of the works of California Development Company. For various reasons the request was denied.

## XI

In the Fall of 1904, the California Development Company's heading in Mexico began to wash out. In 1905, the Colorado River scoured the Mexican cut to river dimensions, and in November of that year completely changed its course, sending a flood of water through the Alamo Canal and over the broad flat area of the Imperial Valley. As a consequence, for many months the entire flow of the river passed through the washed-out heading, through the Alamo Canal and into Imperial Valley, creating Salton Sea with a surface area of 330,000 acres, and threatening the entire valley with destruction. The surface of the Salton Sea, formerly nearly dry at an elevation of 273 feet below sea level, was raised to 190 feet below sea level. The efforts of the California Development Company to close the breach were unsuccessful. The Southern Pacific Company's tracks being endangered, the Southern Pacific Company advanced funds to the California Development Company to control the river and took controlling interest therein as security. By utilizing its own resources the Southern Pacific Company closed the breach in the west bank of the river and returned the river to its channel.

## XII

Imperial Irrigation District was organized on July 25, 1911, under the laws of the State of California.

## XIII

In June 1916, the interests of the California Development Company, which had been foreclosed by the Southern Pacific Company earlier that year, passed to Imperial Irrigation District.

## XIV

On February 16, 1918, a contract was executed between the United States and the Imperial Irrigation District calling for cooperative investigation, surveys, and cost estimates relevant to a District proposal for the construction of an All-American canal to connect the arid lands in Imperial Valley with Laguna Dam. A subsequent contract between the same parties, dated October 23, 1918, provided for the District to include the data gathered under the contract of February 16, 1918, with other data which it would collect relating to a connection with Laguna Dam. The contract of October 23, 1918, was terminated by the contract of December 1, 1932, between the United States and the District, except for the District's obligation thereunder to make payments to the United States for the right to use Laguna Dam. In 1909, the Reclamation Service constructed Laguna Dam on the Colorado River, about 10 miles north of Yuma, Arizona, as a diversion structure for the South Yuma Reclamation Project.

## XV

On November 24, 1922, the Colorado River Compact was signed by commissioners representing the States of Arizona, California, Colorado, Nevada, New Mexico, Utah and Wyoming. It became effective June 25, 1929.

## XVI

In 1922–1923 the District acquired all of the mutual water companies that had been organized by California Development Company. Since that time and until the present, the District has performed the entire function of distributing the water supply to farm holdings in Imperial Valley.

## XVII

Pursuant to the Act of December 21, 1928, 43 U.S.C. § 617, commonly known as the "Boulder Canyon Project Act",

the Secretary of the Interior was authorized to construct, operate and maintain a dam and incidental works in the mainstream of the Colorado River at Black Canyon or Boulder Canyon, a diversion dam known as the Imperial Dam, and a canal and appurtenant structures connecting Imperial Dam with the Imperial and Coachella Valleys, known as the All-American Canal. The Boulder Canyon Project Act became effective June 25, 1929, by Presidential Proclamation (46 Stat. 3000, 1929).

### XVIII

At the time the Project Act took effect on June 25, 1929, the Imperial Irrigation District had a distribution system comprising 612,658 acres, which distribution system was wholly financed, constructed, maintained and operated by local means. The distribution system network then, as of June 25, 1929, comprised approximately 1,700 miles of main and lateral canals, providing for the irrigation by waters diverted by it from the Colorado River of approximately 424,000 privately owned acres, computed on a single crofting basis. All of said acreage was, as of June 25, 1929, being irrigated by and with Colorado River water.

### XIX

On December 1, 1932, the United States and the District, acting pursuant to the Project Act entered into a contract. The 1932 contract with Imperial Irrigation District provided for construction of a main canal connecting Imperial and Coachella Valleys, but because of conflicts not material to this case, Coachella Valley landholders were not included in Imperial Irrigation District, but formed a separate district, the Coachella Valley County Water District, which executed a similar, though independent contract with the United States, dated October 15, 1934, calling for construction of water delivery structures and delivery of water to lands in Coachella Valley.

### XX

Following execution of the All-American Canal Contract, an in rem action, under the caption DuBois v. All Persons, was commenced in the Superior Court of the State of California for the County of Imperial for a confirmation of the proceedings on the part of the District for the authorization of the execution of the contract. At or about the same time, a landowner in the District, Charles Malan, filed an action in the same court against the District and its directors to enjoin the expenditure of any money in furtherance of said contract. Malan also filed an answer in the confirmation action initiated by the District. In both pleadings, Malan alleged the invalidity of the All-American Canal Contract, in part, because of his contention that Section 5 of the Reclamation Act of 1902 would apply under the Contract and would deprive him of his water rights, without compensation, for all his lands in excess of 160 acres.

### XXI

The Malan action was consolidated with the District's in rem confirmation action. Evan T. Hewes, new President of the District was substituted in place of John DuBois, so that the caption of the consolidated action became Hewes v. All Persons. On July 1, 1933, judgment was entered in the *Hewes* case confirming the execution of the Contract. In its opinion, the court held that "section 5 of the Reclamation Law does not apply". An appeal was taken and thereafter dismissed, and on February 26, 1934, said judgment became final.

### XXII

Pursuant to the Project Act, the government constructed Hoover Dam at Black Canyon, and incidental works, completing the construction of said dam in 1935. On February 1, 1935, the Secretary began storing water in Lake Mead, the reservoir created by Hoover Dam, and since that date has continuously operated and maintained Hoover

Dam for the purposes specified in the Project Act.

## XXIII

After the Project Act was enacted and became effective, construction of Hoover Dam was initiated on September 17, 1930, and water was first impounded on February 1, 1935. The first power was generated on September 11, 1936. Hoover Dam is the principal structure of the Lower Basin mainstream development; impounding the waters of the Colorado River to form Lake Mead, it is situated in Black Canyon on the main channel of the Colorado River 330 miles above the upper Mexican border. This is the world's highest dam, a concrete arch, gravity-type structure having a height of 726.4 feet and a hydraulic height of 575.8 feet. Total original, unsilted storage capacity of Lake Mead was 32,359,000 acre feet. At elevation 1229, the maximum surface area is 162,700 acres. The present usable capacity is approximately 27,200,000 acre feet.

## XXIV

Pursuant to its 1932 contract with the District, the United States constructed Imperial Dam and the All-American Canal, commencing construction in August 1934. In 1940, the United States, while retaining the care, operation and maintenance of these facilities, commenced delivering and diverting stored river water at Imperial Dam and carrying such water through the All-American Canal for use within the District. Also pursuant to the contract, the Secretary transferred to the District, on March 1, 1947, the care, operation and maintenance of the main branch of the All-American Canal west of Engineer Station 1098.

## XXV

Since 1942, the District's entire water supply from the river has been released from storage in Lake Mead, diverted at Imperial Dam, and carried through the All-American Canal. Title to the Imperial Dam and the All-American Canal, as well as to Hoover Dam, is in the United States.

## XXVI

On March 4, 1952, the contract between the United States and the District was amended by a supplemental contract. On May 1, 1952, the Secretary transferred to the District the care, operation and maintenance of the works east of Engineer Station 1908.

## XXVII

The All-American Canal System as provided for in the contract of December 1, 1932, was declared completed by the Contract of March 4, 1952, between the United States and the District. Repayment of construction charges commenced on March 1, 1955. The District's financial obligation was fixed at approximately $25,000,000 repayable in forty annual installments, without interest. All such payments to date have been made from the proceeds from the sale of electrical energy generated by facilities, costing the District approximately $15,000,000, utilizing the hydroelectrical potential of the All-American Canal. The cost of Hoover Dam and powerplant, estimated in 1965 as $174,732,000, is being repaid with interest at 3 percent primarily from power revenues at the dam. One exception to this is that $25,000,000 of the cost of the dam, which was allocated to flood control, will be carried interest free by the government until 1987.

## XXVIII

In 1928 the population of the District was approximately 60,000, and it remained at that level until the 1950's. During the past decade, the population has been approximately 75,000. The annual value of crops now produced in the Imperial Valley is approximately $300,000,000. The entire economy of the Imperial Valley is based on farming and farm support industries.

## XXIX

Somewhere between 45 and 50% of irrigated farms in the District are owned by persons or corporations which do not reside in the Imperial Valley. In the period 1920–1928 somewhere between 35 and 50% of the District's farms were owned by non-residents. Similar percentages of non-resident ownership existed in the Imperial Valley during the intervening years.

## XXX

The present value of farm land in Imperial Valley ranges from $600 to $1200 per acre. When the Secretary of the Interior becomes obligated to prohibit the District from delivering irrigation water to lands owned by non-residents, there will be an immediate and substantial decline in the market value of farm land.

## XXXI

The Irrigation District, as a result of the putting into operation of the All-American Canal, ceased using the Alamo Canal as a vehicle for the transportation of water from the Colorado River to users within the District in 1942. All interests of the District in and to the Alamo Canal and its physical assets, both in California and in Baja California, were sold in 1962.

## XXXII

The District in 1966 diverted and distributed to landowners within the boundaries of the District water for the irrigation of approximately 437,000 acres.

## XXXIII

In 1963, field crops and livestock production, mainly on large-scale farms, had a total value of over $168,000,000, equal to 80% of the value of Imperial County's total agricultural production.

## XXXIV

At no time subsequent to the commencement of delivery of Colorado River water pursuant to the Boulder Canyon Project have the government defendants sought to enforce the residency requirement of the Reclamation Act.

## XXXV

There is no one consistent, reasonable administrative interpretation of Section 5 of the Reclamation Act which would warrant the court's recognition as being controlling in this action.

From the foregoing Findings of Fact the court draws the following

## CONCLUSIONS OF LAW

### I

This court has jurisdiction of the cause by reason of 28 U.S.C.A. § 1361 which confers jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty owed to the plaintiff.

### II

Defendant Rogers C. B. Morton is Secretary of the Interior of the United States and is charged with the duty of carrying out the provisions of the Reclamation Act of June 17, 1902, and is charged with the duty of carrying out the operative provisions of the Reclamation Act of June 17, 1902, and all acts amendatory and supplementary thereto by reason of Section 10 of the Act of June 17, 1902 (32 Stat. 390, 43 U.S.C. § 373). Defendant Ellis L. Armstrong is Commissioner of Reclamation of the United States and is charged with the duty of administering the Reclamation Act under the supervision and direction of Defendant Morton pursuant to 43 U.S.C. § 373a. Defendant Edward A. Lundberg is Regional Director of the Bureau of Reclamation of the United States for Region 5 and is in charge of reclamation projects within the territorial jurisdiction of this court.

### III

The government defendants owe a duty to plaintiffs to enforce the residen-

cy requirement of Section 5 of the Reclamation Act in the Imperial Valley of California.

## IV

Section 5 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S.C. § 431, provides in pertinent part as follows:

> "No right to the use of water for land in private ownership . . . shall be made to any landowner unless he be an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of said land . . . . "

By reason of Section 14 of the Boulder Canyon Project Act, 45 Stat. 1065, 43 U.S.C.A. § 617m, the land limitation provisions of reclamation law are made applicable to the construction, operation and management of the works authorized under the Boulder Canyon Project Act, including the residency requirement of Section 5 of the Reclamation Act of 1902.

## V

The requirement of residency of Section 5 of the Reclamation Act of June 17, 1902, is a prerequisite to the receipt of Boulder Canyon project water in the Imperial Valley and imposes a condition on the receipt of such water.

## VI

The intervention by landowners is a class action intervention in behalf of all non-resident owners of irrigable land in Imperial Irrigation District, Rule 23(b)(1)(B), Fed.R.Civ.P.

## VII

Plaintiffs have standing to bring this action.

## VIII

Section 46 of the Omnibus Adjustment Act of May 25, 1926, 44 Stat. 649, 43 U.S.C. § 423e does not supersede or annul the residency requirement of Section 5 of the Reclamation Act.

## IX

There has been no "charge" for water, or for the use, storage or delivery of water for irrigation or water for potable purposes in the Imperial Valley as prohibited by Section 1 of the Project Act, 43 U.S.C. § 617.

## X

Section 6 of the Project Act, 43 U.S.C. § 617 and Article 8 of the Colorado River Compact are not in conflict with the residency requirement of Section 5 of the Reclamation Act, for the reason that Section 6 of the Project Act and Article 8 of the Compact are conditioned upon the requirement of residency as required in Section 5.

## XI

The *in rem* judgment in Hewes v. All Persons is not an adjudication that the residency requirement of Section 5 of the Reclamation Act of 1902 has no applicability to privately owned, irrigable lands in the Imperial Irrigation District.

## XII

The final *in rem* judgment in Hewes v. All Persons is not *res judicata* as to plaintiffs and said judgment does not bar their prosecution of the within action.

## XIII

The administrative interpretation by the government defendants in administering Section 5 of the Reclamation Act in the Imperial Valley by not enforcing the residency requirement is not now, and has never been reasonable. The failure to apply the residency requirement is contrary to any reasonable interpretation of the reclamation law as a whole, and it is destructive of the clear purpose and intent of national reclamation policy.

## XIV

The present and past interpretation of Section 5 of the Reclamation Act by the

government defendants is not controlling as to the proper interpretation as to the present applicability of the residency requirement of Section 5 of the Reclamation Act of 1902. Administrative practice cannot thwart the plain purpose of a valid law and prior administrative practice does not remedy an absence of lawful authority.

## XV

Landowners allegedly relied on the administrative interpretation of the relevant statute to the effect that the residency rquirement of Section 5 of the Reclamation Act of 1902 did not apply to Imperial Valley Irrigation District. This Court finds that the administrative interpretation was not reasonable and such interpretation is not controlling upon this Court.

## XVI

Congress did not adquiesce in and ratify the administrative interpretation of the residency requirement (non-enforcement) by the Department of the Interior.

## XVII

The existence of present perfected rights is within the exclusive jurisdiction of the Supreme Court. (Arizona v. California, 376 U.S. 340, 341, 84 S.Ct. 755, 11 L.Ed.2d 757, 383 U.S. 268, 86 S.Ct. 924, 15 L.Ed.2d 743). If this Court had jurisdiction to determine this issue, it would hold that private landowners within the Imperial Valley Irrigation District have no vested and present perfected rights to a continued supply of Colorado River water for irrigation purposes precluding application of the residency requirement of Section 5 of the Reclamation Act of 1902.

## XVIII

The residency requirement of Section 5 of the Reclamation Act is a continuing restriction upon the right to receive project water, not only until the completion of repayment of construction costs of the All-American Canal but continu-ing in perpetuity until Congress changes the reclamation law by appropriate statutory enactment.

## XIX

The motion by landowner defendants and the government defendants for reconsideration of this court's Partial Summary Judgment of November 23, 1971, is granted and the partial summary judgment is affirmed.

## XX

The matters alleged in paragraphs 13, 27, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48 and 49 of the landowners' Answer in Intervention are insufficient as a matter of law to constitute a sufficient defense to the within action. Accordingly, plaintiffs' motion to strike said paragraphs and all evidence offered at the trial in support of the allegations of said paragraph is hereby granted.